**STATE of Utah, Plaintiff and Appellee,**

v.

**H. Ted SHEPHERD, Defendant and Appellant.**

**No. 981098–CA.**

Court of Appeals of Utah.

Oct. 21, 1999.

---

Theodore E. Kanell, Hanson, Epperson & Wallace, Salt Lake City, for Appellant.

Jan Graham, Attorney General, Kris C. Leonard, and Robert K. Hunt, Assistant Attorneys General, Salt Lake City, for Appellee.

Before WILKINS, P.J., and BILLINGS, and ORME, JJ.

## OPINION

BILLINGS, Judge:

¶1 Defendant H. Ted Shepherd appeals from his convictions on seven counts of violating the Utah Uniform Securities Act (the Act) and a restitution order based on the convictions. We affirm his convictions on all counts. We reverse and remand the restitution order.

## BACKGROUND

¶2 "In reviewing a jury verdict, we view the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict. We recite the facts accordingly." *State v. Hamilton,* 827 P.2d 232, 233–34 (Utah 1992) (citations omitted).

¶3 Defendant was the president and primary stockholder of Northlake Industries (Northlake), owning ninety-five percent of the stock. He claimed Northlake had a new technology to economically produce fuel from oil shale, coal, and tar sand. In 1991 and 1992, Defendant undertook to sell some of his Northlake stock to local residents of the Vernal area. He sold the stock through other company officers and longtime Vernal residents, Byron Merrell and Wallace Church.

¶4 In 1991, Defendant told Merrell that he needed four or five people to invest in Northlake to provide money pending a merger with Uintah Basin Land and Minerals. Merrell organized a meeting that five or ten local residents attended. At the meeting, also attended by Defendant, Merrell showed a video produced by Northlake demonstrating the production process and showing a previously abandoned production facility. The video emphasized that the facility was in very good condition and ready to operate on short notice, with accessible source minerals nearby. The video created the impression that Northlake was operating, was profitable, and had access to the shown facility. No disclosure of the risks of the investment were made, nor was any literature regarding Northlake provided.

¶5 Additional similar meetings were held to encourage investment in Northlake. Church, who invested after the first meeting, also began selling stock to local residents. He offered Northlake stock to business clients at his insurance agency in Vernal, as well as to friends, neighbors, family, and other locals. He also offered stock to people referred to him by Defendant, including three of the victims in this action. Church had no restrictions on with whom he could talk about the investment opportunity. Church passed on to potential investors the information Defendant had given him. He told people that Northlake was going to merge with another company and go public. He did not provide literature about Northlake, nor did he mention risks or limitations to facility access, nor did he explain how investment proceeds would be used.

¶6 Based on the material omissions and misleading information provided to investors

and the indiscriminate marketing of the securities, Defendant was charged with one count of acting as a securities broker-dealer without a license in violation of Utah Code Ann. § 61–1–3(1) (1997),[1] one count of selling an unregistered security in violation of Utah Code Ann. § 61–1–7 (1997),[2] and five counts of securities fraud in violation of Utah Code Ann. § 61–1–1 (1997).[3] After trial, the jury convicted Defendant on all counts. As part of the sentence, the court ordered Defendant to pay double restitution. Defendant now appeals his convictions and the restitution order.

## ANALYSIS

### I. Void for Vagueness

¶ 7 Defendant argues that his convictions for selling securities without a license and selling unregistered securities should be overturned because the Act under which he was convicted is unconstitutionally vague as applied to him. Under section 61–1–7, it is unlawful to offer or sell an unregistered security unless "the security or transaction is exempted under Section 61–1–14." Utah Code Ann. § 61–1–7 (1997). Among the exemptions listed in section 61–1–14 are "transactions not involving a public offering." *Id.* § 61–1–14(1)(n). Defendant asserts that because the term "public offering" is not specifically defined in the Act, he could not know whether his conduct was exempt under the Act. He contends the Act is thus unconstitutionally vague.

¶ 8 "When reviewing the constitutionality of a statute, we must presume that the statute is constitutional." *State v. Krueger*, 975 P.2d 489, 495 (Utah Ct.App. 1999). The challenger bears the burden of demonstrating the unconstitutionality of a statute. *See Greenwood v. City of North Salt Lake*, 817 P.2d 816, 819 (Utah 1991). Furthermore, unconstitutionality of a statute must be shown beyond a reasonable doubt. *See Krueger*, 975 P.2d at 495. Appellate courts review constitutional challenges for correctness. *See id.*

¶ 9 A statute "will be held unconstitutionally vague only if the terms of the law are so ambiguous that persons of ordinary intelligence are unable to determine whether their acts conform to the law." *Elks Lodges 719 & 2021 v. Department of Alcoholic Beverage Control*, 905 P.2d 1189, 1202 (Utah 1995) (citations omitted). A challenger of the application of a law to their own conduct "must demonstrate either that the [statute] does not provide them adequate notice or that the [statute] could be arbitrarily enforced against [him]." *Greenwood*, 817 P.2d at 820.

¶ 10 Defendant contends that because the term "public offering" is not defined in the statute, he was not provided adequate notice to guide his conduct. However, the failure to define a statutory term is not necessarily fatal to a statute. *See State v. Owens*, 638 P.2d 1182, 1184 (Utah 1981) (upholding constitutionality of statute when term "gross deviation" was not defined); *Krueger*, 975 P.2d at 496 (noting adequate notice of prohibited conduct even when statute failed to define term "delinquent"); *Salt Lake City v. Lopez*, 935 P.2d 1259, 1265 (Utah Ct.App.1997) (holding failure to define "emotional distress" in statute "does not render the statute unconstitutionally vague"). Though statutes must contain sufficient cer-

---

1.  "It is unlawful for any person to transact business in this state as a broker-dealer or agent unless the person is licensed under this chapter." Utah Code Ann. § 61–1–3(1) (1997).

2.  "It is unlawful for any person to offer or sell any security in this state unless it is registered under this chapter or the security or transaction is exempted under Section 61–1–14." Utah Code Ann. § 61–1–7 (1997).

3.  Section 61–1–1 provides:
    It is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly to:

(1) employ any device, scheme, or artifice to defraud;
(2) make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or
(3) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.
Utah Code Ann. § 61–1–1 (1997).

tainty to permit conformance to law, "neither absolute exactitude of expression nor complete precision of meaning can be expected." *Owens*, 638 P.2d at 1183. "The determinative factor is whether there is a reasonable degree of common understanding of what is encompassed within the general terms of prohibition." *Id.*

¶ 11 The term "public offering" within a securities context provides a "reasonable degree of common understanding" sufficient to avoid constitutional difficulties. The Act provides that those terms not specifically defined in the statute be assigned the "meaning commonly accepted in the business community," thereby providing context for the term "public offering." Utah Code Ann. § 61-1-13(27) (Supp.1999). Furthermore, the Act explicitly permits the construction of its terms to be coordinated with federal interpretations of related federal regulations. *See id.* § 61-1-27 (1997). The meaning of the term "public offering" in the federal securities context has been settled for many years, thereby providing the business community with a common understanding of what is encompassed within the exemption.

¶ 12 The United States Supreme Court defined the private offering exemption in *SEC v. Ralston Purina Co.*, 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494 (1953). In *Ralston Purina*, a company sold stock to "key employees" without registering the offering. *See id.* at 120–21, 73 S.Ct. at 982. The company argued the sales were exempt because they did not involve a public offering, but rather were limited to only certain employees in a range of employment positions. *See id.* at 121–22, 73 S.Ct. at 983.

¶ 13 The Court rejected a numerical benchmark for determining what is a public offering, and instead looked to the purpose of the securities act in molding a definition.

> The design of the statute is to protect investors by promoting full disclosure of information thought necessary to an informed investment decision. The natural way to interpret the private offering exemption is in light of the statutory purpose. Since exempt transactions are those as to which "there is no practical need for [the bill's] application," the applicability of [the exemption] should turn on whether the particular class of persons affected needs the protection of the Act. An offering to those who are shown to be able to fend for themselves is a transaction "not involving any public offering."

*Id.* at 124–25, 73 S.Ct. at 984 (footnote omitted) (first alteration in original).

¶ 14 The key inquiry is whether a potential investor would be in a position to "have access to the same kind of information that the Act would make available in the form of a registration statement." *Id.* at 125–26, 73 S.Ct. at 985. Thus, the definition of "public offering" involves evaluating the class of investor and investors' access to information.

¶ 15 In light of the judicial interpretation of the statutory term "public offering," the term is definite enough to provide adequate notice of proscribed conduct "when measured by common understanding and commercial practice." *State v. Taubman*, 78 Ohio App.3d 834, 606 N.E.2d 962, 968 (1992). Any initial uncertainty regarding the term was cured by "the judicial gloss placed on the legislation by the Supreme Court." *United States v. Crosby*, 294 F.2d 928, 952 (2d Cir. 1961) (holding securities statute constitutional in light of judicial interpretation of term public offering), *cert. denied*, 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523 (1962).

¶ 16 Defendant argues that, because no prior Utah case has explicitly adopted the federal interpretive gloss, the Utah statute is unconstitutionally vague. We disagree. The business community has had an operable definition of public offering for over forty years. When a businessperson operates in a highly regulated arena such as the sale of securities, he must make certain that he is complying with all technical requirements.

¶ 17 Furthermore, administrative guidance regarding the exemption was available to Defendant. Pursuant to section 61-1-25, Defendant could have requested an interpretive opinion from the Division of Securities (the Division) to aid him in determining whether the transactions were exempt. *See* Utah Code Ann. § 61-1-25(5) (1997) ("The division in its discretion may honor requests

from interested persons for interpretative opinions."). Moreover, the Division has promulgated administrative rules that provide guidance regarding the private offering exemption and a safe harbor for those who act pursuant to the rule. *See* Utah Code Admin. P. R177–14–2n (1990) (current version at Utah Code Admin. P. R164–14–2n (1996)). While the statute places the burden of showing qualification for an exemption on the claimant, *see* Utah Code Ann. § 61–1–14.5 (1997), these administrative mechanisms aid in that determination.

¶ 18 The Utah Supreme Court has noted the value of administrative remedies in clarifying statutory language. *See Greenwood*, 817 P.2d at 820. In *Greenwood*, dog owners challenged the constitutionality of a city ordinance imposing restraints on "vicious dogs," alleging the ordinance was vague. *See id.* at 817. The court acknowledged "the ordinance could have been written more clearly," but noted that any dog owner unclear about the scope of the law could request an administrative determination, thus clarifying the law's application. *Id.* at 820. Similarly, Defendant could have asked for an interpretive opinion or taken advantage of a safe harbor provision designed to protect those who, in good faith, believe their transactions to be exempt.

¶ 19 Accordingly, we conclude Defendant had sufficient notice of the conduct proscribed by the Act, and the Act was constitutional as applied to him.

## II. Jury Instructions

¶ 20 Next, Defendant asserts that the jury instruction regarding the exemption for transactions not involving a public offering was erroneous. An assertion on appeal that a jury instruction incorrectly stated the law presents a question of law which we review for correctness. *See State v. Tinoco*, 860 P.2d 988, 989–90 (Utah Ct.App.1993).

¶ 21 Defendant asserts that the jury instruction regarding the private offering exemption was incomplete and incorrect. Jury instruction number 28 provided:

The defendant has raised a defense to the charge of failure to register a security. He claims that the sales were part of a non-public offering under the provisions of the Utah Securities Act.

The State must prove beyond a reasonable doubt that this exemption is not available to the defendant. You may consider any factor which you believe is relevant in deciding this issue, among those you may consider are the manner in which Northlake stock was offered and the size of the Northlake stock offering.

¶ 22 We agree that this instruction is incomplete in defining when a transaction is exempt because it is not a public offering. It does not identify the critical inquiry of whether investors have access to information required by a registration nor whether the investors need the protection of the Act.

¶ 23 Though less than complete, the instruction was not totally inaccurate. In fact, the instruction given was more favorable to Defendant than a complete instruction would have been. Even if we find error in the jury instruction, "we will not reverse [a] defendant's conviction unless that error is harmful." *Tinoco*, 860 P.2d at 990. For an error to be harmful, there must be "a reasonable probability the error affected the outcome" of the case. *Id.* Defendant has not shown how the omission in this jury instruction negatively impacted the outcome of this case. Any error in the private offering instruction was harmless.

## III. Insufficient Evidence

¶ 24 Defendant further asserts that the evidence was insufficient to support his convictions on five counts of securities fraud. He argues the state failed to prove specific elements of the crimes charged beyond a reasonable doubt.

¶ 25 The burden is heavy on a defendant challenging the sufficiency of the evidence. *See State v. Vessey*, 967 P.2d 960, 966 (Utah Ct.App.1998). Defendant "must first marshal all the evidence supporting the jury's verdict and then demonstrate how this evidence, even viewed in the most favorable light, is insufficient to support the verdict." *State v. Strain*, 885 P.2d 810, 819 (Utah Ct.App.1994). Defendant utterly fails to car-

ry his burden. He merely recites his own version of the facts, and presents none of the evidence supporting the convictions. Because he has not marshaled the evidence, we will not consider this argument further. *See State v. Scheel,* 823 P.2d 470, 473 (Utah Ct.App.1991).

## IV. Jury Questions

■ ¶ 26 Defendant also contends his right to due process was violated because the trial court permitted jurors to ask questions. He asserts this process resulted in premature jury deliberations. However, his assertions are conclusory statements without factual or legal support.

■ ¶ 27 Rule 24 of the Utah Rules of Appellate Procedure provides briefing standards. A requirement of an appellate brief is that the "argument shall contain the contentions and reasons of the appellant with respect to the issues presented ... with citations to the authorities, statutes, and parts of the record relied on." Utah R.App. P. 24(a)(9). "Implicitly, rule 24(a)(9) requires not just bald citation to authority but development of that authority and reasoned analysis based on that authority." *State v. Thomas,* 961 P.2d 299, 305 (Utah 1998). Defendant's brief fails to cite relevant legal authority or provide any meaningful analysis regarding the issue of jury questions. "This court has routinely declined to consider arguments which are not adequately briefed on appeal." *Burns v. Summerhays,* 927 P.2d 197, 199 (Utah Ct.App.1996) (citation omitted). Because the briefing on this issue is inadequate, we decline to consider the merits.

## V. Peremptory Challenges

■ ¶ 28 Defendant alleges the prosecution illegally discriminated in jury selection by using all four peremptory challenges to strike white male jurors, thus violating his right to a fair trial. Striking potential jurors solely on the basis of race or gender violates constitutional equal protection principles. *See J.E.B. v. Alabama,* 511 U.S. 127, 146, 114 S.Ct. 1419, 1430, 128 L.Ed.2d 89 (1994) (holding exercise of peremptory challenges based on gender unconstitutional); *Batson v. Ken-*

*tucky,* 476 U.S. 79, 93–94, 106 S.Ct. 1712, 1721, 90 L.Ed.2d 69 (1986) (holding use of peremptory challenges to strike racial minority jurors unconstitutional). "To successfully attack a peremptory challenge, a defendant must 'establish a prima facie case of purposeful discrimination in selection of the ... jury.'" *State v. Alvarez,* 872 P.2d 450, 455 (Utah 1994) (quoting *Batson,* 476 U.S. at 96, 106 S.Ct. at 1723).

■ ¶ 29 "To establish a prima facie case, a defendant must demonstrate facts and circumstances that raise the 'necessary inference of purposeful discrimination.'" *Id.* (quoting *Batson,* 476 U.S. at 96, 106 S.Ct. at 1723). In Utah, the elements necessary to establish a prima facie case include: "(1) as complete a record as possible, (2) a showing that persons excluded belong to a cognizable group ... and (3) a showing that there exists 'a strong likelihood that such persons are being challenged because of their group association rather than because of any specific bias.'" *Id.* at 456 (citations omitted).

■ ¶ 30 Defendant asserts he has established a prima facie case of discrimination because the prosecution used all four peremptory challenges to strike white male jurors. While "[n]umerical evidence alone may be sufficient to establish a pattern of peremptory strikes against minority jurors," *id.* at 457, numerical evidence alone does not necessarily establish a prima facie case. *See id.* at 458. Moreover, "[t]he 'mere fact that the subject of the peremptory strike is a minority member does not alone raise the inference of discriminatory intent.'" *Id.* (quoting *State v. Cantu,* 750 P.2d 591, 597 (1988)). "[A]s a general rule, a 'defendant who requests a prima facie finding of purposeful discrimination is obligated to develop [some] record beyond numbers, in support of the asserted violation.'" *Id.* at 457 (quoting *United States v. Brown,* 941 F.2d 656, 659 (8th Cir.1991)) (alteration in original).

¶ 31 Defendant has failed to establish a prima facie case of discrimination. He has provided no information regarding the composition of the venire that would give context for the number of peremptory challenges. Thus, even his numerical argument fails to

establish a pattern of strikes, absent information about the gender make up of the venire. He also does not demonstrate, nor even argue, that the prosecutor made discriminatory comments or asked discriminatory questions in dismissing the potential jurors. We conclude Defendant failed to make the required showing.[4]

## VI. Restitution

¶ 32 Finally, Defendant asserts, and the State concedes, that the trial court erred in ordering him to pay double restitution. Though courts at one time had authority to order double restitution, the statute in effect at the time of Defendant's restitution hearing provided no such authority. *Compare* Utah Code Ann. § 76–3–201(4)(a)(i) (1995) (when a crime results in pecuniary damages, "the court shall order that the defendant make restitution up to double the amount of pecuniary damages"), *with* Utah Code Ann. § 76–3–201(4)(a)(i) (Supp.1999) (when pecuniary damages result, "the court shall order that the defendant make restitution to victims of crime"). The trial court plainly acted beyond the scope of its statutory authority in ordering Defendant to pay double restitution. Thus we reverse and remand for entry of an order of simple restitution.

---

4. Though the trial court based its conclusion on the erroneous assumption that white males are not a protected, cognizable group, we may affirm on any proper basis. *See State v. South,* 924 P.2d 354, 357 (Utah 1996).

## CONCLUSION

¶ 33 First, we conclude that the Utah Securities Act is constitutional as applied to Defendant because the term public offering has a long established meaning within the business community, and is thus not unconstitutionally vague. Second, we conclude that any error in the private offering exemption jury instruction was harmless. Third, we conclude that Defendant failed to establish a prima facie case of discrimination for the purpose of challenging the prosecution's peremptory challenges in jury selection. Finally, we remand for entry of an order of simple restitution.

¶ 34 I CONCUR: MICHAEL J. WILKINS, Presiding Judge.

¶ 35 I CONCUR, EXCEPT THAT AS TO SECTIONS III AND IV, I CONCUR ONLY IN THE RESULT: GREGORY K. ORME, Judge.