37 P.3d 1172 (2001)
2001 UT App 308
STATE of Utah, in the Interest of S.A., a person under eighteen years of age.
M.A., Appellant,
v.
State of Utah, Appellee.
No. 20000265-CA.
Court of Appeals of Utah.
October 18, 2001.
Rehearing Denied December 10, 2001.
*1174 Gregory B. Wall, Wall & Wall, Salt Lake City, for Appellant.
Mark L. Shurtleff, Attorney General and John Peterson, Attorney General's Office, Salt Lake City, for Appellee.
Martha Pierce, Salt Lake City, Guardian Ad Litem.
Before Judges GREENWOOD, JACKSON, and BILLINGS.

OPINION
GREENWOOD, Presiding Judge.
¶ 1 This is one of two appeals that stem from a juvenile court adjudication regarding the parents of S.A.[1] The State filed a petition alleging M.A. (Mother) had caused the death of her infant son T.A. and that S.A, her older son, was a sibling at risk. The State contended Mother was solely responsible for T.A.'s death and, therefore, D.A. (Father) was not a party to the adjudication phase of the juvenile court proceedings.
¶ 2 Mother appeals the juvenile court's decision finding her responsible for T.A.'s death and finding S.A. to be a sibling at risk.

BACKGROUND[2]
¶ 3 Mother and Father are married and are the biological parents of two sons: S.A., born January 24, 1996, and T.A., born May 25, 1999, who died September 14, 1999. On September 13, 1999, Mother was home alone with her two children. T.A. was fussy and off his normal schedule. The family had recently moved into a new home and had not established telephone service, so Mother drove to a phone booth to call Father. Father stated that Mother sounded stressed during their conversation. After returning home, Mother put T.A. in his crib around 2:30 for his afternoon nap, but he awoke between 3:00 and 3:20. When Mother heard T.A. fussing, she rocked him and placed him back in the crib. She then went to make dinner.
¶ 4 Father arrived home from work between 4:00 and 4:30 p.m. Mother met him at the top of the stairs, which was unusual. Normally, Father checked on T.A. when he returned from work, but on this day he showered first. Mother asked him to eat dinner before showering. It was also unusual for dinner to be prepared when Father arrived at home.
¶ 5 After dinner, Mother asked Father to get T.A. up. Father found T.A. lying face down in the crib with his right arm over his head. Father, believing T.A. was seriously ill or dead, screamed that T.A. was dead. Mother came into the room, but stayed away from the baby. She told Father to start CPR and went to a neighbor's home to call 911.
¶ 6 Father administered five rounds of CPR before the EMTs arrived and continued resuscitation efforts. The EMTs immediately took T.A. to Tooele Regional Medical Center (TRMC). As efforts to revive T.A. continued, he was life-flighted to Primary Children's Medical Center (PCMC). The TRMC physician did not see any retinal hemorrhaging during T.A.'s exam.
¶ 7 T.A. was admitted to the PCMC Pediatric Intensive Care Unit where resuscitation efforts were successful. The pediatrician specializing in critical care, Dr. Vernon, examined T.A. Dr. Vernon found extensive retinal hemorrhaging, anoxic brain injury, and diffuse brain swelling so severe he did not *1175 believe that the child could live. T.A. was not brain dead upon admission, but was nearly so. Dr. Vernon explained the findings to both parents who, in his opinion, acted odd in that they sat at opposite sides of the room instead of together comforting each other, which was more common in his experience. Dr. Vernon's diagnosis was a non-accidental trauma and that T.A. had been in acute distress for a few hours prior to being admitted to PCMC. Mother and Father granted permission to remove T.A. from life support when physicians told them he was brain dead. T.A. died shortly thereafter on September 14, 1999.
¶ 8 Because retinal injuries like those T.A. suffered are often indicative of child abuse, medical personnel called the police and the Department of Child and Family Services (DCFS). DCFS removed S.A. from his home. A shelter hearing took place on September 17, 1999, and the juvenile court granted DCFS temporary custody of S.A. After a kinship study, S.A. was placed with his maternal grandparents.[3]
¶ 9 In its petition, the State alleged that Mother caused T.A.'s death and that S.A. should continue in DCFS custody as a sibling at risk.
¶ 10 Mother was charged with murder on October 13, 1999. Mother filed a motion to strike the adjudicative hearing on the State's petition until after the criminal case had been resolved. The juvenile court denied the motion.
¶ 11 The State filed a motion requesting that Father obtain separate counsel because the State contended Mother caused T.A.'s death and Father was not responsible. Mother and Father opposed the motion because of the potential financial burden it would place on the family and contended any conflict between the parents was speculative. The juvenile court granted the State's motion. The juvenile court also heard arguments regarding Father's status in this matter. The State argued "there would be no adjudication pursued as to the father and that he had only been subpoenaed as a witness." The trial court determined that no allegations were made against Father, and, therefore, he was not a party to the adjudication. The trial court informed Father's counsel he would be allowed only to rehabilitate Father as a witness and could not otherwise participate during the trial.[4] During this same hearing, both Mother and Father presented oral motions to the court asking it to dismiss the case as the trial was scheduled to begin after the sixty-day deadline imposed by statute. Father also made a motion to intervene. The trial court denied the motions.
¶ 12 During the adjudication hearing[5] on the State's petition, the State presented further medical evidence to demonstrate T.A.'s death was not accidental. Mother argued T.A. had a "near miss" Sudden Infant Death Syndrome event and the prolonged CPR caused the ocular damage. The State's experts testified that Mother's theories were improbable. Two physicians testified that brain damage was the cause of death and that it probably occurred at the same time as the ocular damage. The juvenile court found Mother abused T.A. and caused his death and S.A. was a sibling at risk. Both Father and Mother appealed the juvenile court's decision.[6] This opinion addresses Mother's appeal.

ISSUES AND STANDARDS OF REVIEW
¶ 13 Mother first contends her due process rights were violated when the State proceeded against her in separate proceedings in separate forums involving the same factual issues.[7] Mother also argues her due process *1176 rights were impaired when she chose to exercise her Fifth Amendment right against self-incrimination by not testifying in the juvenile court proceeding, to prevent the State from using her testimony in the pending criminal prosecution. Mother further argues the trial court erred in ordering Father to obtain separate counsel. She argues the cost of two attorneys, as well as the potential costs of expert witnesses, compromised her ability to defend herself and violated her due process rights.
¶ 14 "`Constitutional issues, including. . . due process, are questions of law which we review for correctness.'" In re Adoption of S.L.F., 2001 UT App 183, ¶ 9, 27 P.3d 583 (quoting In re K.M., 965 P.2d 576, 578 (Utah Ct.App.1998)).
¶ 15 Regarding the juvenile court's decision to order Father to obtain separate counsel, the State argues this case is analogous to cases in which the court assigns substitute counsel in criminal prosecutions, which are reviewed under an abuse of discretion standard. See State v. Pursifell, 746 P.2d 270, 272 (Utah Ct.App.1987). We agree. However, "substitution of counsel is mandatory when . . . a conflict of interest" exists. Id. at 274.
¶ 16 Mother also contends the simultaneous proceedings violated res judicata principles. The application of res judicata or collateral estoppel is a question of law, reviewed for correctness. See In re J.J.T., 877 P.2d 161, 162 (Utah Ct.App.1994). However, this court has applied a more flexible approach when reviewing child welfare cases involving these doctrines. See In re E.R., 2000 UT App 143, ¶ 12, 2 P.3d 948.
¶ 17 Finally, Mother argues that because the adjudication hearing occurred after the sixty-day time period required by Utah Code Ann. § 78-3a-308 (Supp.2000), the juvenile court lost jurisdiction. We review "issues requir[ing] statutory interpretation. . . for correctness, giving no deference to the trial court." S.L.F., 2001 UT App 183 at ¶ 9, 27 P.3d 583. Whether a juvenile court retains jurisdiction is a question of law, reviewed for correctness. See In re A.M.S., 2000 UT App 182, ¶ 11, 4 P.3d 95.

ANALYSIS

I. MOOTNESS
¶ 18 "We first address the threshold issue of whether [Mother]'s claims are moot." In re N.R., 967 P.2d 951, 953 (Utah Ct.App. 1998). In In re S.A., 2001 UT App 307, 37 P.3d 1166, also decided today, we address Father's arguments on appeal, and for the reasons set forth therein, we reverse the decision of the juvenile court and remand this case for a new adjudication in which both parents may fully participate. Because the reversal in Father's case mandates a reversal in Mother's case as well, Mother's issues are technically moot.
¶ 19 However, when issues may arise again on remand this court has a duty to address them. See Bair v. Axiom Design, L.L.C., 2001 UT 20, ¶ 22, 20 P.3d 388. Additionally, although this court, as a general rule, does not issue advisory opinions, we may address the construction of a statute that is frequently applied by the trial courts. See In re N.R., 967 P.2d at 953. In the present case, Mother raises some issues that may arise again on remand. Mother also argues section 78-3a-308(2), which is frequently applied by the juvenile court, required a dismissal of her case. We therefore address most of Mother's arguments.[8]

II. DUE PROCESS ARGUMENTS

A. Multiple Proceedings
¶ 20 Mother argues the State violated her due process rights by bringing multiple actions against her in the district court criminal *1177 prosecution and the juvenile court child welfare case. Both the United States Supreme Court and this court have allowed persons to be prosecuted criminally and simultaneously be subject to civil proceedings. See United States v. Kordel, 397 U.S. 1, 11, 90 S.Ct. 763, 769, 25 L.Ed.2d 1 (1970) (noting that under the facts of the case the government did not violate due process by pursuing civil forfeiture while also proceeding against defendant in criminal setting).
¶ 21 This court recognized the likelihood of parallel court proceedings in In re A.R., 937 P.2d 1037 (Utah Ct.App.1997), cert. dismissed, and aff'd. by, 1999 UT 43, 982 P.2d 73. In that case, this court stated: "Of course, child abuse is also a crime and there exists the possibility of a parallel or subsequent criminal prosecution based on the same underlying acts. This is not relevant to the instant inquiry, for such a criminal prosecution is a completely independent proceeding." Id. at 1043 (citation omitted) (emphasis added). We also agree with the State that the best interests of at risk children are not served when juvenile proceedings are stayed pending the outcome of criminal prosecutions. See In re V.A., 105 Misc.2d 254, 432 N.Y.S.2d 137, 142 (N.Y.Fam.Ct.1980); In re K.W., 2000 OK Civ App 84, ¶¶ 7-9, 10 P.3d 244. Therefore, Mother's due process rights are not violated by multiple or simultaneous proceedings.

B. Fifth Amendment
¶ 22 Mother also contends the exercise of her Fifth Amendment right to decline to testify in the juvenile court proceedings deprived the juvenile court of necessary information regarding the cause of T.A.'s death. Mother states she could not testify in the juvenile court proceeding because the State could use any testimony later in the criminal proceedings. Because her testimony was essential to the juvenile court case, Mother contends her due process rights were violated. However, Mother does not address the issue further. She cites no case law nor does she provide any analysis of how the exercise of her Fifth Amendment right in the juvenile court prejudiced her due process rights.
¶ 23 When a "brief fails to cite relevant legal authority or provide any meaningful analysis regarding [an] issue," this court will not consider appellant's argument. State v. Shepherd, 1999 UT App 305, ¶ 27, 989 P.2d 503; see also Utah R.App. P. 24; Green v. Louder, 2001 UT 62, ¶ 34, 29 P.3d 638. We can only presume Mother wishes this court to determine what due process or fundamental rights were affected by her choice not to testify, and if these rights were affected to such a degree as to require reversal. However, "[b]ecause the briefing on this issue is inadequate, we decline to consider the merits" of Mother's claim. Shepherd, 1999 UT App at ¶ 27, 989 P.2d 503.

C. Separate Counsel
¶ 24 Mother also asserts that the juvenile court's order requiring Father to obtain separate counsel impaired her due process rights because it increased the financial burden on the family. She also contends Father did not need separate counsel. We disagree. The juvenile court properly ordered Father to obtain separate counsel and this order did not violate Mother's due process rights.

1. Order to Obtain Separate Counsel
¶ 25 We agree with the Guardian ad Litem and the State that joint representation of Mother and Father in this case presented a conflict of interest. A conflict of interests exists when parties have inconsistent interests. See State v. Newman, 928 P.2d 1040, 1044 (Utah Ct.App.1996). To obtain custody of S.A., Father would have had to distance himself from Mother because Father was not charged with any act relating to the death of T.A. The Guardian ad Litem was willing to recommend Father have custody of S.A., but only if Father's primary interest was S.A.'s well-being. The juvenile court recognized and addressed these issues with Father. Additionally, Father's counsel, who represented Father below and on appeal, acknowledged at oral argument that his client had a conflict of interest with Mother. Although Mother argues the potential conflict is entirely conjectural, the record indicates otherwise, and Father's own attorney's statements during oral argument indicate a conflict existed between Mother and Father. Once a conflict is established, separate counsel *1178 is mandatory. See State v. Pursifell, 746 P.2d 270, 274 (Utah Ct.App.1987); Utah Rules Prof'l Conduct R. 1.7 (With limited exceptions "[a] lawyer shall not represent a client if the representation of that client will be directly adverse to another client ... or if the representation of that client may be materially limited by the lawyer's responsibilities to another client.").

2. Financial Burden
¶ 26 Having determined that the juvenile court properly ordered Father to obtain separate counsel, we next examine Mother's argument that the cost of separate counsel created a financial hardship that impaired her due process rights. The State contends this argument fails because Mother and Father had the opportunity to seek appointed counsel in the juvenile court. See Utah Code Ann. § 78-3a-913 (Supp.2000). Despite the availability of appointed counsel throughout the proceedings, neither party requested appointed counsel nor submitted affidavits of impecuniosity or other documents demonstrating their inability to meet the costs of legal counsel.
¶ 27 Section 78-3a-913, in contrast to Mother's argument, specifically protects the rights of parents and minors. This section states in part:
The parents ... shall be informed that they have the right to be represented by counsel at every stage of the proceedings. They have the right to employ counsel of their own choice and if any of them requests an attorney and is found by the court to be indigent, counsel shall be appointed by the court ....
Id. at § 78-3a-913(1)(a) (emphasis added). In the present case, the juvenile court communicated to Father that if he needed appointed counsel, counsel would be made available to him.
¶ 28 Further, even if Mother and Father did not qualify for appointed counsel, Mother has provided no case law or analysis suggesting that financial hardship constitutes a violation of due process. Because Mother has not properly briefed the issue, we decline to consider it further. See Utah R.App. P. 24(a)(9); Burns v. Summerhays, 927 P.2d 197, 199 (Utah Ct.App.1996).

III. RES JUDICATA AND COLLATERAL ESTOPPEL
¶ 29 Mother argues the juvenile court proceedings should have been continued until the conclusion of the criminal proceeding. She argues res judicata and collateral estoppel principles require this result. Mother correctly states that the purposes of res judicata include avoiding inconsistent decisions and relieving parties from the costs of multiple lawsuits. See In re J.J.T., 877 P.2d 161, 162 (Utah Ct.App.1994). She argues the juvenile proceeding and the criminal proceeding involve the same facts and parties. She contends the common issue in both proceedings is the cause of T.A.'s death, and therefore, these simultaneous proceedings violate res judicata principles. We disagree.
¶ 30 Mother recognizes the burden of proof differs between the two cases, but argues the essential facts are the same. Mother therefore concludes that underlying principles of res judicata required the juvenile court to stay the juvenile proceeding until the criminal proceeding had been concluded. She cites Lewis v. Moultree, 627 P.2d 94, 96 (Utah 1981), for the proposition that a "common ground for a stay is the pendency of another action involving identical parties and issues where a decision in one action settles the issue in another. . . ." The Lewis court, however, also stated that a trial court's decision to stay proceedings in these circumstances is discretionary. See id. Nevertheless, although a conviction in the criminal proceeding would control the juvenile court as to her culpability for T.A.'s death, Mother's argument fails if the criminal court acquitted her, as the State could still pursue her in a juvenile proceeding with its lower burden of proof.[9]See United States v. One Assortment of 89 Firearms, 465 U.S. 354, 362, 104 S.Ct. 1099, 1104, 79 L.Ed.2d 361 (1984) ("It is clear that the difference in the *1179 relative burdens of proof in criminal and civil actions precludes the application of the doctrine of collateral estoppel.").
¶ 31 Further, res judicata does not apply if the same claims are not pursued in the separate proceedings. In In re J.J.T., we concluded that a prior hearing on neglect did not have preclusive effect on a later hearing terminating parental rights. We stated: "The juvenile court properly distinguished between the neglect proceeding and the proceeding terminating appellant's parental rights. In so doing, the court [correctly] held the prior proceeding was not res judicata as the parties did not litigate the same claim or demand in each proceeding." In re J.J.T., 877 P.2d at 165-66. In that case we noted the differences between a neglect proceeding and a proceeding to terminate parental rights. See id. at 166.
¶ 32 In the present case, the proceedings are also distinct. The juvenile court adjudication was held to determine if M.A. caused the death of T.A. and if S.A. was a child at risk. The subsequent dispositional hearing determined S.A.'s placement and care, and future services to be rendered to the family. The criminal proceeding involves the criminal culpability of Mother, and, unlike the other proceedings, requires that Mother be found guilty beyond a reasonable doubt.
¶ 33 In sum, the different demands, goals, and burdens of proof in the multiple proceedings prevent the application of res judicata. Cf. One Assortment of 89 Firearms, 465 U.S. at 361, 104 S.Ct. at 1104 ("The time has come to clarify that neither collateral estoppel nor double jeopardy bars a civil, remedial forfeiture proceeding initiated following an acquittal on related criminal charges.").

IV. JURISDICTION UNDER SECTION 78-3a-308
¶ 34 Section 78-3a-308(2) provides: "The pretrial may be continued upon motion of any party, for good cause shown, but the final adjudication hearing shall be held no later than 60 calendar days from the date of the shelter hearing." Utah Code Ann. § 78-3a-308(2) (Supp.2000). Mother argues the sixty-day time limit had expired prior to the adjudication hearing and the juvenile court therefore lacked jurisdiction. She cites In re S.C., 1999 UT App 251, 987 P.2d 611, in which this court stated: "[W]e conclude the sixty-day limitation imposed by section 78-3a-308(2) is mandatory and that the trial court must hold the adjudication hearing on the State's abuse and neglect petition within sixty days of the shelter hearing." Id. at ¶ 15.
¶ 35 The Guardian ad Litem contends section 78-3a-308(2) is mandatory, but not jurisdictional, because any delay by the trial court could result in dismissal of DCFS petitions. The Guardian ad Litem notes children would be returned to potentially dangerous homes and families would not receive needed services. The State also argues section 78-3a-308(2) is not jurisdictional, and contends that In re S.C. did not suggest the statute is jurisdictional, but acknowledged that the purpose of the Child Welfare Reform Act is to assure that juvenile court child welfare cases move quickly. See id. at ¶ 13.
¶ 36 The holding in State v. Tyree, 2000 UT App 350, 17 P.3d 587, supports both the Guardian ad Litem's and State's interpretation of the statute. In that case, the criminal defendant claimed the trial court lost jurisdiction over him because it failed to sentence him within the forty-five-day time period required by Utah Rule of Criminal Procedure 22. See id. at ¶ 6. This court disagreed and held that the language of the rule was not jurisdictional. See id. at ¶¶ 7-8. Further, this court observed that although jurisdiction cannot be waived, the rule allowed the court to postpone sentencing with defendant's concurrence. See id. at ¶ 8. This court held that this language indicates the rule is directory and not jurisdictional. See id. The present case is similar. Rule 54 of the Utah Rules of Juvenile Procedure allows the parties to stipulate to a continuance of the requisite hearing. See Utah R. Juv. P. 54(c). In In re S.C., we held that the sixty-day limit could be waived by strict compliance with Rule 54. 1999 UT App at ¶ 20. The possibility of waiver negates the possibility of the statute being jurisdictional.
¶ 37 Therefore, a failure to hold the adjudicative proceeding within sixty days does not divest the juvenile court of its jurisdiction. *1180 In the present case, the juvenile court had jurisdiction to hold the adjudication hearing after the expiration of the sixty-day time period.[10]

CONCLUSION
¶ 38 We reverse and remand this case for the reasons set forth in Father's companion appeal. Because several of the issues raised by Mother in her appeal may arise again on remand, we have addressed them.
¶ 39 We first conclude that requiring Mother to participate in and defend herself in multiple proceedings does not violate her due process rights. Additionally, we do not address whether her choice to exercise her right not to testify in one proceeding led to the deprivation of any other right because Mother failed to properly brief this issue.
¶ 40 The juvenile court properly ordered Father to obtain separate counsel because of a conflict of interest. Mother had access to court-appointed counsel if she could not afford an attorney. Therefore, her due process rights are protected by legislative enactments guaranteeing her right to appointed counsel in the face of financial hardship. Additionally, Mother has not presented case law or analysis to support her argument that financial hardship, alone, deprives her of due process.
¶ 41 Principles of res judicata or collateral estoppel have no application to the these proceedings. Res judicata does not apply to distinct criminal and civil proceedings with different demands and distinct burdens of proof.
¶ 42 Finally, we conclude that Utah Code Ann. § 78-3a-308(2) (Supp.2000) is mandatory insofar as it directs juvenile courts to promptly adjudicate juvenile matters. The statute is not jurisdictional, however, and the failure of the juvenile court to hold the adjudicative hearing within sixty days of the shelter hearing does not divest the juvenile court of jurisdiction.
¶ 43 Nonetheless, we reverse the decision of the juvenile court for the reasons set forth in our opinion discussing Father's appeal. We remand this case to the juvenile court.
¶ 44 WE CONCUR: NORMAN H, JACKSON, Associate Presiding Judge, and JUDITH M. BILLINGS, Judge.
NOTES
[1] The companion case to the present case addresses the father's appeal. See In re S.A., 2001 UT App 307, 37 P.3d 1166.
[2] Mother does not directly challenge the factual findings of the juvenile court and we recite them accordingly. However, Mother includes a recitation of facts in her brief in an effort to demonstrate that the State had all its experts in place and that she lacked the time and resources to present her own defense.
[3] At oral argument, counsel for Mother stated S.A. has now been returned to his parents.
[4] Father argues this action by the juvenile court denied him his due process rights and statutory right to representation. We agree with Father in the companion case and base our reversal of both cases on his argument. See In re S.A, 2001 UT App 307, 37 P.3d 1166.
[5] See Utah Code Ann. §§ 78-3a-308 to -311 (1996 & Supp.2000) (stating procedures related to adjudication hearing).
[6] The juvenile court conducted a dispositional hearing to determine S.A.'s placement. See Utah Code Ann. § 78-3a-311 (Supp.2001). Both parents participated in this portion of the juvenile court proceedings and they do not challenge the actions of the juvenile court during this phase.
[7] Mother appears to claim that there were three proceedings  the criminal case, the juvenile court abuse case, and a proceeding involving listing her on the juvenile database of child abusers. She does not provide any analysis involving the database proceeding, and, therefore, we do not address it. See Utah Code Ann. §§ 62A-4a-116 to -116.5 (Supp.1999).
[8] We do not address Mother's argument that the requirement that the adjudication hearing take place within sixty days after the shelter hearing, see Utah Code Ann. § 78-3a-308 (Supp.2000), violated her due process rights, because she did not have adequate time to prepare her case and secure expert witnesses. On remand, Mother will have had almost two years to locate witnesses to testify on her behalf. We therefore need not determine if the sixty-day time period allotted by the statute is unconstitutional as applied to her.
[9] A criminal conviction requires that Mother's guilt be proven beyond a reasonable doubt. See Utah Code Ann. § 76-1-501(1) (1999). An abuse case "brought before the juvenile court ... must be proved by clear and convincing evidence." Utah R. Juv. P. 41(c).
[10] We do not wish to imply that the sixty-day requirement in section 78-3a-308(2) is meaningless. Rather, we emphasize that the purpose of the statute is to expedite juvenile court proceedings in favor of children who are in need of prompt placement in an appropriate environment. See In re S.C., 1999 UT App 251, ¶ 13, 987 P.2d 611. We encourage juvenile courts to adhere to the guidelines of the statute.