**2013 UT App 61**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,

*Plaintiff and Appellee,*

*v.*

CODY JESSE AUGUSTINE,

*Defendant and Appellant.*

Memorandum Decision
No. 20110454-CA
Filed March 7, 2013

Third District, Salt Lake Department
The Honorable Judith S.H. Atherton
No. 081905753

Stephen W. Howard, Attorney for Appellant
John E. Swallow and Karen A. Klucznik, Attorneys for Appellee

JUDGE JAMES Z. DAVIS authored this Memorandum Decision,
in which JUDGES J. FREDERIC VOROS JR.
and STEPHEN L. ROTH concurred.

DAVIS, Judge:

¶1     Cody Jesse Augustine appeals his conviction for attempted murder, a first degree felony, *see* Utah Code Ann. § 76-5-203(2)–(3) (LexisNexis 2012);[1] *id.* §§ 76-4-101, -102, arguing that the trial court's exclusion of his expert witness and permitting the prosecu-

---

1. Where subsequent amendments to the relevant statutory provisions do not affect our analysis, we cite the most recent version of the Utah Code.

tion to call Scott Stapley[2] as a witness after Stapley made it clear that he would refuse to testify amounted to a violation of his constitutional right to present a full, fair, and complete defense. Augustine also argues that his trial counsel was ineffective for failing to object to the jury instruction given regarding the State's burden of disproving his extreme emotional distress affirmative defense and that the jury instructions also failed to adequately inform the jury as to what mens rea was required for accomplice liability. We affirm.

## I. Extreme Emotional Distress

¶2     One of Augustine's main defenses at trial was that he acted under extreme emotional distress at the time of the attack on the victim (J.E.), which, if believed by the jury, would have resulted in a conviction of the lesser offense of attempted manslaughter. Augustine testified at trial that he ultimately became "[un]hinged" after a series of events occurring in the evening hours between July 28 and 29, 2008, that culminated in his stabbing J.E. with a knife several times while J.E. fled from Stapley's assault with a four-bladed battle-ax. Augustine sought to support his extreme emotional distress defense with expert witness testimony and proffered that the expert would testify as to "significant issues in [Augustine's] background, childhood and onward, that would affect his ability to deal with certain stressors" involved in this case. The trial court, however, excluded the expert testimony on relevance grounds, explaining that extreme emotional distress involves "an objective, . . . reasonable person" standard and, as proffered, the expert testimony would address only a subjective standard of whether the behavior "was reasonable for this individual." Augustine argues that the trial court's determination was incorrect and that, as a result, his constitutionally protected right

---

2. Augustine and Stapley were jointly charged with attempted murder, but the cases were ultimately severed. *See generally State v. Stapley*, 2011 UT App 54, 249 P.3d 572.

to present witnesses and evidence in support of his defense was violated.

¶3    We review the trial court's decision to exclude expert testimony for an abuse of discretion and "to ensure that no mistakes of law affected [the] lower court's use of its discretion." *State v. Sheehan*, 2012 UT App 62, ¶ 15, 273 P.3d 417 (citation and internal quotation marks omitted). We affirm the trial court's exclusion of the expert testimony, but we do so on slightly different grounds than those cited by the trial court. *See generally Medel v. State*, 2008 UT 32, ¶ 23, 184 P.3d 1226 ("[W]e have authority to affirm the district court's decision on any grounds apparent in the record . . . .").

¶4    "A person suffers extreme emotional distress when exposed to extremely unusual and overwhelming stress such that the average reasonable person would react by experiencing a loss of self-control." *State v. Spillers*, 2007 UT 13, ¶ 14, 152 P.3d 315 (citation and internal quotation marks omitted). "This standard requires a trier of fact to put herself in the shoes of a reasonable person in the defendant's situation to determine whether the defendant's reaction to a series of events was reasonable." *State v. White*, 2011 UT 21, ¶ 37, 251 P.3d 820. In analyzing a claim of extreme emotional distress, the defendant's "reaction cannot be viewed in isolation" because a "broader context" will help paint "an accurate picture of the past experiences and emotions that give meaning to that reaction." *Id.* ¶ 31; *see also State v. Shumway*, 2002 UT 124, ¶ 10, 63 P.3d 94 (determining that an instruction on an extreme emotional distress defense was warranted where the teenager, who ultimately stabbed his friend to death, was a victim of bullying for many years).

¶5    While Augustine's expert witness's testimony would support a subjective distress analysis by explaining Augustine's behavior in light of the other traumatic experiences that have occurred in his life, Augustine has not convinced us that he is entitled to the defense in the first place. *See generally White*, 2011 UT

21, ¶ 22 (noting that the affirmative defense of extreme emotional distress "is not available to all who seek it"). The defense cannot be based on emotions and stress a defendant brought about himself; rather, "a person suffers from an extreme emotional disturbance when he is *exposed* to extremely unusual and overwhelming stress." *Shumway*, 2002 UT 124, ¶ 9 (citation and internal quotation marks omitted). This distinction of "exposed" versus "self-imposed" "guide[s] the evaluative process of extreme emotional distress claims in our courts." *White*, 2011 UT 21, ¶¶ 22–23 (recognizing that because "all intentional homicides, with the exception of those by cold-blooded killers or in the course of a felony, are abnormal acts for the perpetrators and the result of strong emotions and stresses[,] . . . a distinction must be drawn so that this defense will only be applicable to those homicides which appropriately qualify under the underlying purpose of this mitigating defense and not en masse to all acts constituting murder, in the second degree" (citation and internal quotation marks omitted)).

¶6     Here, Augustine bases his entitlement to an extreme emotional distress defense based on the culmination of three "triggering events."[3] First, Augustine felt "anger, distress, [and]

---

3. Augustine notes that a defendant is not required "to show a highly provocative triggering event that was contemporaneous with [his] loss of self-control" to be entitled to an instruction on the extreme emotional distress defense. *See State v. White*, 2011 UT 21, ¶ 30, 251 P.3d 820 (citation and internal quotation marks omitted). It is true that "a building emotional reaction to a series of events may *contribute* to extreme emotional distress," and that "an external triggering event" need not occur contemporaneously. *Id.* ¶ 32 (explaining that "[a]n external trigger is a necessary predicate to access the defense because other preeminent causes of emotional distress—organic causes relating to mental illness and self-inflicted causes—are expressly rejected as a form of distress under the statute"). However, while Augustine's childhood traumas may

(continued...)

grief" when he worried that the painful urination he had begun experiencing might be a sexually transmitted disease (STD) that he concluded he must have contracted from his girlfriend, who must have contracted it from her last sexual partner, J.E. Second, shortly after Augustine self-diagnosed his ailments as an STD, he drove to J.E.'s house seeking retribution and got into a fistfight, which spiked his adrenaline. Last, the sight of blood and Stapley knocked down during the altercation with J.E. caused Augustine to panic. As a result of the combined pressure of these three stressors, Augustine asserts, he lost control of his rationality and was driven to stab J.E. repeatedly.

¶7     We are unconvinced that such a sequence of events merits an extreme emotional distress defense. The triggering stressors that Augustine enumerates are largely self-imposed—he sought out J.E. for retribution for what was an assumption that J.E. indirectly passed along an STD to Augustine. Augustine went to J.E.'s house looking for a fight. Thus, the ensuing fight and adrenaline spiking are products of his own behavior. Augustine admitted as much at trial, affirmatively answering the State's question as to whether his "anxiety to a pretty significant extent is something [he] caused [him]self." Likewise, the escalation of the fight to involve Stapley and weapons are factors that Augustine brought upon himself by seeking out a fight and bringing a weapon in the first place. "Thus, defendant's emotional disturbance was a product of his knowingly or intentionally involving himself in the commission of a crime and [is not] excusable [under the extreme emotional distress defense]." *See State v. Gardner*, 789 P.2d 273, 276, 283 (Utah 1989) (internal quotation marks omitted) (holding that any error in the jury instructions regarding the defense of extreme emotional distress was harmless where "[t]he triggering event" prompting the

---

3. (...continued)
have contributed to the stress he felt the evening of the attack on J.E., it does not change the fact that the "external triggering event[s]" Augustine specifically identifies were self-created.

defendant to go on a shooting spree "was his escape attempt [from custody in court] in which he was wounded"). Because Augustine was not entitled to a defense of extreme emotional distress, we need not address his claims that the trial court erroneously excluded his expert witness under the Utah Rules of Evidence, that the exclusion of his witness violated his constitutional rights, and that his trial counsel was ineffective for not challenging the jury instruction given on the affirmative defense of extreme emotional distress. *See generally Jones v. Cyprus Plateau Mining Corp.*, 944 P.2d 357, 360 (Utah 1997) ("Harmless errors are those that are sufficiently inconsequential so no reasonable likelihood exists that the error affected the outcome of the proceedings."); *State v. Buel*, 700 P.2d 701, 703 (Utah 1985) (concluding that trial counsel's failure to make futile objections does not constitute ineffective assistance).

## II. Mental State Instruction

¶8 Next, Augustine argues that although the accomplice liability jury instruction quoted the relevant statutory provision verbatim, it nonetheless was confusing and incomplete. Specifically, Augustine asserts that the instruction given failed "to adequately instruct the jury that the mental state required in order to find him guilty of attempted murder as an accomplice was the actual intent to cause death." (Internal quotation marks omitted.) Without further clarification, Augustine contests, the jury instructions "left the door open for the jury to find Augustine guilty of attempted murder based on Stapley's intent to cause death, even if they believed Augustine intended only to inflict serious bodily injury." The State contends that "the instructions as a whole accurately and adequately informed the jury of the mental state necessary to convict [Augustine] as an accomplice to attempted murder." We agree with the State.

¶9 "[W]e review challenges to jury instructions under a correctness standard." *State v. Featherhat*, 2011 UT App 154, ¶ 8, 257 P.3d 445.

> Jury instructions must be read and evaluated as a whole. They must accurately and adequately inform a criminal jury as to the basic elements of the crime charged. However, if taken as a whole they fairly instruct the jury on the law applicable to the case, the fact that one of the instructions, standing alone, is not as accurate as it might have been is not reversible error.

*State v. Lucero*, 866 P.2d 1, 3 (Utah Ct. App. 1993) (citations omitted). Accordingly, "[e]ven if we find error in the jury instruction, we will not reverse [a] defendant's conviction unless that error is harmful." *State v. Shepherd*, 1999 UT App 305, ¶ 23, 989 P.2d 503 (second alteration in original) (citation and internal quotation marks omitted).

¶10    Here, instruction twelve explains the accomplice liability standard by quoting the relevant statutory provision word-for-word: "Every person, acting with the mental state required for the commission of an offense who directly commits the offense, who solicits, requests, commands, encourages, or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable as a party for such conduct." *See* Utah Code Ann. § 76-2-202 (LexisNexis 2012). This instruction clearly indicates that a requirement of accomplice liability is that the accomplice "act[] with the mental state required for the . . . offense," which in this case was attempted murder. Instruction fifteen outlines the elements of attempted murder:

> Before you can convict the defendant of the offense of Attempted Criminal Homicide, Murder, . . . you must find from all of the evidence and beyond a reasonable doubt each and every one of the following elements of that offense that is alleged to have occurred on or about July 28–29, 2008:

1.     That in Salt Lake County, State of Utah;

2.     The defendant intentionally attempted to cause the death of another person; and

3.     That the victim suffered serious bodily injury in the course of the offense.

Thus, even assuming the jury focused on the accomplice liability instruction in the face of compelling evidence of Augustine's liability as a principal, this instruction clearly indicates that a conviction for attempted murder requires a finding that the defendant had the "intent[ to] attempt[] to cause the death of another person" or, as the parties referred to it throughout the trial, the "inten[t] to kill." Thus, reading instructions twelve and fifteen together, the mens rea required for accomplice liability was adequately explained by the jury instructions provided. *Cf. State v. Larsen*, 876 P.2d 391, 396–97 (Utah Ct. App. 1994) (affirming the given jury instruction as adequate where "the instruction properly followed the language of the [relevant] statute and additional instructions clearly defined the requisite intent"); *Lucero*, 866 P.2d at 3 (noting that room for improvement in a given jury instruction does not render the instruction given inadequate).

### III. Calling Stapley as a Witness

¶11    Last, Augustine contends that after Stapley informed the court of his intention to remain silent, having Stapley subsequently refuse to testify in the presence of the jury allowed the State to support its case with the inferences that could be drawn from Stapley's refusal, thereby denying Augustine his constitutional right to a fair trial. We review questions of constitutional law for correctness. *See State v. Martinez*, 896 P.2d 38, 39–40 (Utah Ct. App. 1995). We affirm the trial court's decision.

¶12    The issue here boils down to whether the conversation that occurred outside of the jury's presence during which Stapley indicated that he had been planning on refusing to testify amounted to his having actually invoked a Fifth Amendment privilege. A witness's "exercise of the [Fifth Amendment] privilege is not evidence to be used in the case by any party." *State v. Travis*, 541 P.2d 797, 799 (Utah 1975) (emphasis, citation, and internal quotation marks omitted); *see also State v. Maestas*, 2012 UT App 53, ¶ 62, 272 P.3d 769 ("[O]ut of concern that a defendant's invocation of the Fifth Amendment may improperly prejudice his standing before the court or jury, a defendant is even prohibited from calling a codefendant to the stand to force him to invoke his privilege against self-incrimination." (citation omitted)). It is considered unprofessional conduct when an attorney "calls a witness to testify who he knows will claim a valid privilege not to testify for the purpose of impressing upon a jury the fact that the privilege is being claimed." *State v. Schreuder*, 712 P.2d 264, 274 (Utah 1985). Nonetheless, an attorney "'need not accept at face value every asserted claim of privilege, no matter how frivolous.'" *United States v. Torrez-Ortega*, 184 F.3d 1128, 1137 (10th Cir. 1999) (quoting *Namet v. United States*, 373 U.S. 179, 188 (1963)). It "is sufficient to defeat [the] suggestion [that a witness is being called for an] improper . . . purpose" when the attorney calling the witness has "a colorable—albeit ultimately invalid—argument" that the witness could not validly claim the privilege. *See id. Compare Namet*, 373 U.S. at 188 (concluding that it was not reversible error to allow the prosecutor to call witnesses to the stand who had given advance notice of their intention to invoke the Fifth Amendment where "the prosecutor initially did not believe that the [witnesses] could properly invoke their privilege against self-incrimination, reasoning with some justification that their pleas of guilty to the gambling charges would erase any testimonial privileges as to that conduct," and where that "view of the law was supported by substantial authority"), *with United States v. Martin*, 526 F.2d 485, 487 (10th Cir. 1975) (determining that "the trial court did not err in refusing to permit [a witness] to be called to the stand and thus be compelled to invoke his Fifth Amendment rights in the presence of

the jury" when "[a]ll concerned knew full well that the [witness] intended to invoke his Fifth Amendment right not to testify[, h]e had already done so successfully at the first trial[,] . . . it was assumed . . . that the [witness]'s claim of privilege was a valid one[, and] . . . [d]efense counsel in the trial court did not in any[ way] suggest that the [witness]'s claim was invalid"). Thus, "reversible error is [not] invariably committed whenever a witness" is called before the jury and "claims his privilege not to answer." *Namet*, 373 U.S. at 186; *accord State v. Boyland*, 495 P.2d 315, 317 (Utah 1972).

¶13 Here, neither the trial court nor Stapley's counsel were sure as to whether Stapley could validly claim a Fifth Amendment privilege in Augustine's case. The trial court stated,

> Mr. Stapley, it's by no means clear to me that you have a Fifth Amendment right to not testify. So I'm not sure you can[] constitutionally [refuse to] testify. Based on the fact that you testified at your trial and you were found guilty, and I'm not sure that that means there is one, but I think there is, arguably there is a Fifth Amendment right. But I will tell you as a matter of law, it's not clear to me whether you can assert that.

Stapley's trial counsel noted that he had explained to Stapley the possible ramifications of refusing to testify in this case if the court determined that he did not have a valid Fifth Amendment right, including the possibility that he could be charged with obstruction of justice or held in contempt, and Stapley confirmed that he understood. He was then dismissed from the courtroom and the trial court explained that for Stapley to validly claim his Fifth Amendment right, he needed to do so on the witness stand. Augustine's trial counsel agreed that it was not clear whether Stapley would refuse to testify, but nonetheless requested that Stapley be called to claim the privilege without the jury present out of concern that Stapley's refusal would lead the jury to draw prejudicial inferences against Augustine. The trial court denied

Augustine's request. Stapley took the stand in the presence of the jury and responded to the court's attempt to swear him in by stating, "I refuse to." The court then clarified with Stapley if it was his decision "not to say anything," to which Stapley responded, "Yes." The trial court excused Stapley, the State rested, and Augustine proceeded to present his defense.

¶14     Under the facts and circumstances of this case, we do not believe that error, let alone reversible error, occurred or that Augustine's constitutional rights were violated when the trial court permitted the State to call Stapley as a witness simply because there was a likelihood that Stapley would refuse to testify regardless of whether he could validly do so. The parties and the trial court were unsure whether Stapley could validly claim the privilege. Stapley was present when both his trial counsel and the trial court expressed their hesitation as to whether Stapley could validly claim a Fifth Amendment privilege in this case and he was reminded by his counsel and the court what the ramifications of remaining silent would be if the privilege was deemed inapplicable. Given the emphasis on the uncertainty as to what Stapley's rights were in this case, it was reasonable for the State to call Stapley to allow him the opportunity to change his mind and to determine if the trial court would accept Stapley's exercise of the privilege. This is far from a situation where the prosecutor "call[ed] a witness who he kn[ew would] claim a valid privilege not to testify, for the purpose of impressing upon the jury the fact of the claim of privilege." *See Travis*, 541 P.2d at 799 (citation and internal quotation marks omitted). The State did not pose any questions to Stapley before he was excused, Stapley uttered four words on the witness stand, and the trial court denied the State's attempt to recall Stapley as a rebuttal witness after the defense rested. Without more, we are not convinced that the prosecution's actions amount to what Augustine describes as a "flagrant . . . attempt[] to improperly influence the jury." (Internal quotation marks omitted.) Accordingly, we conclude that it was not reversible error or a violation of Augustine's constitutional rights for the State to request and the trial court to require that Stapley refuse to testify

in the presence of the jury. *Cf. McBride v. State*, 477 A.2d 174, 186–88 (Del. 1984) (concluding that it was not error for the trial court to permit the State to call the codefendant as a witness even though he ultimately invoked his Fifth Amendment right to refuse to testify because the codefendant "had clearly waived his Fifth Amendment right not to testify by having testified in his own defense at his earlier trial," "the record [did] not establish that the State knew to a certainty that [the codefendant] would refuse to give any testimony," and the question "that prompted his refusal to testify further was directed solely to [his own] role in the victim's killing, not [the] defendant's").

¶15    In sum, Augustine was not entitled to the affirmative defense of extreme emotional distress because the stressors he identified as triggering his extreme emotional distress were self-created. As a result, we do not address Augustine's other arguments related to his defense of extreme emotional distress. The jury instructions adequately explained the mens rea requirement for a conviction either as an accomplice or a principal, and it was not a violation of Augustine's constitutional rights to have Stapley assert his Fifth Amendment privilege in the presence of the jury. Affirmed.