**2020 UT App 142**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
OSCAR BERMEJO,
Appellant.

Opinion
No. 20180985-CA
Filed October 22, 2020

Third District Court, Salt Lake Department
The Honorable Richard D. McKelvie
No. 171900190

Wendy Brown, Attorney for Appellant

Sean D. Reyes and Karen A. Klucznik,
Attorneys for Appellee

JUDGE KATE APPLEBY authored this Opinion, in which
JUDGES GREGORY K. ORME and RYAN M. HARRIS concurred.

APPLEBY, Judge:

¶1 Based on his involvement in a gang-related drive-by shooting, Oscar Bermejo was convicted of, among other offenses, aggravated assault and felony discharge of a firearm. He now challenges his convictions, contending that his counsel was constitutionally ineffective for a variety of reasons. He also contends that the district court erred by allowing the jury to have access to certain evidence during deliberations and by denying his mistrial motion based on the prosecutor's improper comments. We affirm.

BACKGROUND[1]

¶2    On the afternoon of December 28, 2016, neighbors observed a black BMW[2] slowly drive more than once past the house of a family (Family) of known Sureños gang members.[3] As it passed, one of the neighbors noted the BMW's license plate number.

¶3    Between the BMW's passes, a sport utility vehicle (SUV) stopped in front of the Family's house. The SUV's driver exited the car with one child, while three other children, including the nine-year-old victim (Victim), remained in the SUV. Shortly after, the BMW passed again and stopped. Someone exited the passenger side of the BMW and fired gunshots toward the SUV. The passenger re-entered the BMW, and it drove away.

¶4    One of the shots struck Victim in the head. He was airlifted to a hospital for surgery and survived.

¶5    Shortly after the shooting, police arrived on the scene, and the Family's neighbor gave police the BMW's license plate number, which matched that of a black BMW registered to Bermejo. Approximately one hour after the shooting, a Salt Lake City resident reported to police that a black BMW had been

---

1. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly." *State v. Barner*, 2020 UT App 68, n.1, 464 P.3d 190 (quotation simplified).

2. A BMW is a vehicle manufactured by Bayerische Motoren Werke.

3. During trial, an expert testified that the Sureños are a Southern California-based gang whose rival gangs include the Norteños. He also testified that the Sureños and Norteños are two of the "largest umbrella gangs" in the Salt Lake area.

abandoned near his house. At trial, one of the investigating detectives testified that cell phone data indicated that approximately twenty-five minutes after the shooting, Bermejo's phone had been in the area where the car was found.

¶6     Police located Bermejo the morning after the shooting and arrested him. In the police interview, Bermejo denied having been in Salt Lake City at all on the day of the shooting and stated that his car went missing from Ogden where he left it at his friend's house, which the friend alerted him to between 1:00 p.m. and 2:00 p.m. the day of the shooting.

¶7     The State charged Bermejo with felony discharge of a firearm with serious bodily injury, a first-degree felony; felony discharge of a firearm, a third-degree felony; obstructing justice, a second-degree felony; aggravated assault, a second-degree felony; and aggravated assault, a third-degree felony.

¶8     The case proceeded to a jury trial, but the State filed a motion in limine[4] seeking permission to offer evidence under rule 404(b) of the Utah Rules of Evidence of other bad acts Bermejo had committed. The State intended to offer evidence of Bermejo's "gang membership and the gang connections of persons in the victim's social network, as well as gang practices culturally relevant to the current case," including evidence of two gang-related jail incidents involving Bermejo. The State asserted the evidence would be offered for the proper non-character purposes of proving Bermejo's intent, motive, knowledge, lack of mistake, and modus operandi; the evidence was relevant; and the evidence was not unfairly prejudicial. The State also filed notice that it would present an expert (Expert) to

---

4. "A motion in limine is a procedure for obtaining a ruling on the admissibility of evidence prior to or during trial, but before the evidence has been offered." 22A C.J.S. *Criminal Procedure & Rights of Accused* § 349 (2016).

testify about "gang culture, gang related activities and local gang rivalries."

¶9     Bermejo acknowledged that, in general, the gang evidence was relevant to the State's theory of the case and was offered for a proper non-character purpose. But before trial, he expressed concerns about having an expert witness testify regarding specific gang-related incidents, arguing that such testimony would be inadmissible hearsay. The district court also voiced its concerns about Expert testifying to specific incidents but reserved ruling on the issue until trial.

¶10     At trial, the State advanced the theory that Bermejo was a party to the shooting, and the jury was instructed accordingly. For proof, the State relied on, among other things, cell phone data, the undisputed presence of Bermejo's car at the site of the shooting, Bermejo's membership in and identity with the Norteños gang, and the history between the local Norteños and the Family—a history that involved repeated shootings and deaths among members of the local Norteños and Sureños between October 2016 and September 2017. In contrast, the defense advanced the theory that Bermejo was not involved in the shooting itself, even if his car was. Bermejo did not dispute that he was a member of the Norteños gang or the fact that his car was used in the shooting, but he asserted that two senior gang members took his car for the shooting and afterward left him to deal with the repercussions of appearing to be guilty because his car was involved. The defense also characterized as socially motivated Bermejo's choice to join and his involvement in the gang, and asserted that, unlike most gang members, Bermejo had no desire to engage in unlawful conduct.

¶11     During the third day of trial, the State called several witnesses to testify about Bermejo's affiliation with the Norteños gang and about two specific incidents that occurred at the jail after Bermejo had been taken into custody. Expert was also called to testify, and he testified about the history between the local Norteños and the Family and about gang culture in

general. Bermejo did not object to the testimony on these subjects.

¶12 After the State rested its case, Bermejo testified as the only defense witness. He said that after taking his girlfriend (Girlfriend) to work on the morning of the shooting, he was "just chilling" at a friend's house in Taylorsville when two senior Norteños members "just kind of showed up" and "start[ed] asking" to "see the keys" to his car. Because they "kept on insisting and insisting to the point where it kind of got threatening," Bermejo acquiesced. The two gang members took his car and returned it about an hour later, telling Bermejo, "If I were you, I wouldn't drive your car for a while" because they "just hit a scrap."[5] Bermejo understood this to mean that they had "just shot a Sureños." At that point, Bermejo and his friend drove the car to a house the friend knew of in Salt Lake City and parked it at the "back of the street" so that "it wouldn't be noticeable," and then Girlfriend picked up Bermejo. Police arrested him the next day.

¶13 Bermejo admitted that at the time of the shooting, he was a member of the Norteños gang and he had joined at the age of thirteen "just to be accepted and just fit in" with his friends. He denied having a desire to "move up and be part of the management of the gang." He also denied knowing the Family or being involved in the shooting. And he admitted to not being completely truthful with the police in his initial encounter with them the day after the shooting, but explained that, at the time, he believed dishonesty was "safer" than being truthful about the gang members.

¶14 In rebuttal, the State recalled a detective (Detective) involved in the investigation and, among other things, questioned Detective about his determination during the investigation that Girlfriend might have been "an important

---

5. Expert testified that "scrap" "is a putdown for Sureños."

witness." Detective testified that despite being subpoenaed, Girlfriend did not appear in court the previous day and he spent the morning "on a manhunt in a sense" trying to find her, but she was "gone." The State stipulated there was no evidence that Bermejo directly contacted Girlfriend to tell her not to come to court. But during cross-examination, Detective suggested that even though there was no evidence in the recorded jail phone calls that Bermejo directly told Girlfriend not to come to court, "that doesn't mean he doesn't have an advocate working for him." In response, trial counsel asked, "That's pure speculation, though, isn't it?" On redirect, the State asked Detective whether it was "actually just speculation," and trial counsel objected to the question as being "beyond rebuttal." The court sustained the objection. Nevertheless, the prosecutor pressed, stating that trial counsel "opened the door" and although trial counsel said it was "just speculation[,] . . . he knew well that it's not just speculation."

¶15 Later, outside the presence of the jury, the prosecutor acknowledged his accusation about what trial counsel knew was "inaccurate" and said he believed he "need[ed] to correct that for the jury." He suggested either giving the jury an instruction or simply allowing him to tell the jury that his statement gave a mistaken impression about what trial counsel knew. Trial counsel declined the offer for a curative instruction and instead moved for a mistrial, expressing concern that correcting the statement would "draw[] attention to the concept that there is some evidence there" when "there hasn't been any evidence presented," and stating that either way "it's a situation that can harm the defense." The court denied the motion, reasoning that "there is an opportunity to correct the record" and to give a curative instruction and, in its view, the statement was "inadvertent" and "pretty fleeting" and was not "an incident that would have called the jury's attention." The court also noted trial counsel indicated he "maybe" intended to address the issue in closing argument in lieu of a curative instruction.

¶16 Finally, after closing arguments, the court addressed whether during deliberations the jury would have access to a video of Bermejo's police interview. Trial counsel argued that under *State v. Cruz*, 2016 UT App 234, 387 P.3d 618, the jury should not have access to the video because it "put undue influence on what he told the police over the testimony of what he said in court." The court allowed the jury to have access to the video during deliberations. It reasoned that unlike the video at issue in *Cruz* that was "actually introduced as testimony of [the witness]," *see id.* ¶ 38, the video of Bermejo's police interview was "introduced as both [an] admission and as [a prior] inconsistent statement" and did not have "the same indicia of being produced for the purpose of testimony."

¶17 The jury convicted Bermejo on all counts. He timely appeals.

ISSUES AND STANDARDS OF REVIEW

¶18 Bermejo raises three main challenges to his convictions. First, he argues his trial counsel was constitutionally ineffective for failing to make certain objections to the evidence and to the accomplice liability instructions. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Hatch*, 2019 UT App 203, ¶ 24, 455 P.3d 1103 (quotation simplified).

¶19 Second, Bermejo argues the district court erred under rule 17 of the Utah Rules of Criminal Procedure by allowing the jury to have access during deliberations to the recording of his police interview. "The interpretation of a rule of procedure is a question of law that we review for correctness." *State v. Cruz*, 2016 UT App 234, ¶ 34, 387 P.3d 618 (quotation simplified).

¶20 Third, Bermejo argues the district court erred by denying his mistrial motion. Alternatively, he argues trial counsel provided ineffective assistance of counsel by failing to object to certain of the prosecution's statements during closing arguments. We review the denial of a mistrial motion for abuse of discretion. *See State v. Butterfield*, 2001 UT 59, ¶ 46, 27 P.3d 1133. And, as discussed above, we decide an ineffective assistance of counsel claim raised for the first time on appeal as a matter of law. *Hatch*, 2019 UT App 203, ¶ 24.[6]

ANALYSIS

I. Ineffective Assistance of Counsel

¶21 Bermejo contends his trial counsel provided constitutionally ineffective assistance in three ways. First, he argues counsel was ineffective for "failing to object to unfairly prejudicial and needlessly cumulative gang evidence" presented during trial. Second, he argues counsel was ineffective for "failing to object to improper expert testimony." Third, he argues counsel was ineffective for "failing to object to the accomplice liability instructions."

¶22 To prevail on his ineffective assistance of counsel claims, Bermejo must show that counsel performed deficiently and that counsel's performance prejudiced him. *See Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). To establish deficient performance, he "must show that counsel's representation fell

---

6. Bermejo also argues his convictions should be reversed under the cumulative error doctrine. But because we perceive no errors, we have no occasion to apply the cumulative error doctrine. *See State v. Eyre*, 2019 UT App 162, ¶ 11 n.3, 452 P.3d 1197 (stating that, where "there are no errors to accumulate, . . . the cumulative error doctrine does not apply" (quotation simplified)), *cert. granted*, 462 P.3d 797 (Utah 2020).)

below an objective standard of reasonableness." *Id.* at 688; *see also State v. Ray*, 2020 UT 12, ¶ 33, 469 P.3d 871. In this respect, trial counsel "is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. Further, counsel does "not have a Sixth Amendment obligation to correct every error that might have occurred at trial, regardless of whether it affected the defendant." *Ray*, 2020 UT 12, ¶ 32. Rather, "[w]e must view a decision to not object in context and determine whether correcting the error was sufficiently important under the circumstances that failure to do so was objectively unreasonable—i.e., a battle that competent counsel would have fought." *Id.*; *see also Strickland*, 466 U.S. at 690.

¶23　To show that "the deficient performance prejudiced the defense," Bermejo must demonstrate "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 687, 694. A "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. In this respect, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. "The demonstration of prejudice must be a demonstrable reality, . . . not simply a speculative matter." *Ross v. State*, 2019 UT 48, ¶ 111, 448 P.3d 1203 (quotation simplified). As a result, the prejudice element "is a relatively high hurdle to overcome." *State v. Garcia*, 2017 UT 53, ¶ 44, 424 P.3d 171. And a reviewing court evaluating prejudice must "consider the totality of the evidence before the judge or jury and then ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *Id.* ¶ 28 (quotation simplified).

¶24　We also note that because Bermejo must establish both deficient performance and prejudice for each of his ineffective assistance claims, "it is not necessary for us to address both components of the inquiry if we determine that a defendant has

made an insufficient showing on one." *Menzies v. State*, 2014 UT 40, ¶ 78, 344 P.3d 581 (quotation simplified).

¶25 Applying these principles, we now address each of Bermejo's ineffective assistance of counsel claims.

## A. Gang and Jail Evidence

¶26 Bermejo contends trial counsel was "ineffective by failing to object to unfairly prejudicial and needlessly cumulative gang evidence" under rule 403 of the Utah Rules of Evidence. Relatedly, he contends counsel was ineffective for failing to object to evidence of the two jail incidents in which he was involved because it was unfairly prejudicial under rule 403.

¶27 "Generally, relevant evidence is admissible." *State v. Gonzalez*, 2015 UT 10, ¶ 36, 345 P.3d 1168; *see also* Utah R. Evid. 402. But through rule 403, the Utah Rules of Evidence provide "an exception to the general rule of admissibility by permitting courts to exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice or needlessly presenting cumulative evidence." *Gonzalez*, 2015 UT 10, ¶ 36 (quotation simplified); *see also* Utah R. Evid. 403. Evidence is unfairly prejudicial if it has "an undue tendency to suggest decision on an improper basis." *State v. Maurer*, 770 P.2d 981, 984 (Utah 1989) (quotation simplified); *see also State v. Downs*, 2008 UT App 247, ¶ 11, 190 P.3d 17 (stating that an "improper basis" for a decision is "commonly but not necessarily an emotional one, such as bias, sympathy, hatred, contempt, retribution or horror" (quotation simplified)).

## 1. Gang Evidence

¶28 Bermejo concedes "the State's theory of the case arguably required introduction of some gang evidence to establish an alleged retaliatory motive." Yet he argues counsel performed deficiently by failing to limit "the quantity" of that evidence and "ensure the gang evidence admitted was closely tied to offenses

charged or theories presented." He argues the amount of gang evidence introduced was harmful because it "encouraged the jury to convict [him] based on a mountain of evidence demonstrating he was a gang member."

¶29 "Evidence that the crime charged is related to the activities of a gang or a person's gang membership has long been admitted in Utah." *State v. High*, 2012 UT App 180, ¶ 23, 282 P.3d 1046. "This court has previously acknowledged that there may be some unfair prejudice inherent in making the jury aware of gang affiliation in a criminal context," *State v. Garcia*, 2017 UT App 200, ¶ 33, 407 P.3d 1061 (quotation simplified), recognizing that "guilt by association is a genuine concern whenever gang evidence is admitted" and that "gang references may lead the jury to attach a propensity for committing crimes to defendants who are affiliated with gangs or allow its negative feelings toward gangs to influence its verdict," *High*, 2012 UT App 180, ¶ 26 (quotation simplified).

¶30 "Nevertheless, gang evidence is often admissible: in the appropriate context, gang evidence has probative value warranting its admission even over claims of prejudice." *Garcia*, 2017 UT App 200, ¶ 33 (quotation simplified). "But even where gang-related evidence is prejudicial, it is not necessarily *unfairly* prejudicial and therefore should be admitted where it has high probative value." *Gonzalez*, 2015 UT 10, ¶ 37. Thus, even if some of the gang-related evidence introduced at trial could be deemed cumulative or prejudicial, Bermejo bears the burden of demonstrating that had trial counsel objected to the evidence on those grounds, there is a reasonable likelihood both that the court would have sustained the objection and that the outcome of the proceedings would have been different. *See Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984); *Garcia*, 2017 UT App 200, ¶¶ 39, 42.

¶31 Conceding some of the evidence "likely should have been admitted" given the State's and the defense's theories of the case, Bermejo argues "gang evidence that did not speak to" his

"membership and role in the Norteños, the targeted home's connection to Sureños, and that Norteños and Sureños were rivals" "should have been excluded." And he argues the "bulk of the gang evidence should have been excluded as needlessly cumulative," particularly where, in his view, "many witnesses who testified spoke to essentially the same singular fact" that he is a Norteños gang member.

¶32 We conclude Bermejo has not established that the admission of the full extent of the gang evidence was prejudicial. *See Strickland*, 466 U.S. at 687, 694. Even if he could establish that an objection to some of it would have been sustained, that showing is not enough to establish prejudice under a claim for ineffective assistance of counsel. Rather, he must "in addition show a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." *State v. Edgar*, 2017 UT App 54, ¶ 13, 397 P.3d 656 (quotation simplified).

¶33 Bermejo attempts to make this showing by suggesting the State "relied on gang evidence to paint [Bermejo] as a bad person," "to cast [Bermejo] as guilty by association," and to distract the jury from the "lack of other evidence" proving Bermejo was a party to the shooting. But although gang-related evidence was presented in the case and the prosecutor emphasized Bermejo's identity as a member of the Norteños gang, any damage resulting from the potentially inadmissible gang evidence "was likely already done by the admission of the fact that [Bermejo] was a gang member, which he concedes was proper," and by the gang evidence about topics which he concedes was acceptable. *See State v. Percival*, 2020 UT App 75, ¶ 43, 464 P.3d 1184; *see also High*, 2012 UT App 180, ¶¶ 51–52 (explaining that even if some of the objectionable gang evidence had been excluded, "the jury would still have heard [other] unchallenged and properly admitted gang evidence," which would have "lessen[ed] the impact of any improperly admitted evidence" and "was unlikely to increase by any significant

degree the negative impact of the properly admitted gang evidence").

¶34 Bermejo conceded the jury properly heard that he is a junior Norteños gang member, that the Norteños and Sureños are rivals, and that the Family had ties to the Sureños. Additionally, the jury heard evidence tying Bermejo to the shooting, at least circumstantially, which drew the narrative he offered at trial into question. It heard the fact that his car was undisputedly at the scene of the shooting; that he abandoned it shortly after the shooting; that there were inconsistencies between the timeline he offered and other forensic evidence presented; and that in his initial interview with the police he lied about where he was on the day of the shooting. Bermejo has not explained how, given this evidence, the admission of potentially inadmissible gang evidence over and above what was properly before the jury specifically harmed his case. Rather, given the evidence properly before the jury and the fact that much of the gang-related evidence advanced both the State's and the defense's theories, we are not confident there is a reasonable probability that the jury's verdict would have been different had some of the gang-related evidence been excluded. *See Edgar*, 2017 UT App 54, ¶ 13.

¶35 For these reasons, we conclude that on balance, Bermejo has not established that his trial counsel was ineffective for failing to object to the admission of certain gang-related evidence during trial.

2.    Jail Evidence

¶36 Bermejo next contends his trial counsel was ineffective for failing to object to evidence "of two specific instances of bad acts" involving "two jail altercations that occurred after the shooting." He argues his counsel "should have objected" to this evidence "under rule 403." More specifically, he argues the testimony about the incidents "lacked probative value" and was unfairly prejudicial because it "focused the jury's attention on

[his] custody status." And he asserts that without this evidence, there is a reasonable probability the trial outcome would have been different, because it was the only evidence suggesting "that [he] was a violent criminal."

¶37 During trial, three officers testified about two jail incidents in which Bermejo was involved. Each occurred while he was incarcerated after the shooting, and each involved gang members who had been involved in the larger rivalry between the local Norteños and Sureños. In the first incident, a Norteños gang member, who was arrested after a drive-by shooting of the Family in September 2017, fought another inmate who was a Norteños dropout. One officer testified that before the fight started, Bermejo told the gang member to "[g]et him" and the gang member acknowledged Bermejo with a "head nod or something," at which point the fight between the two inmates began. Another officer testified that once the inmates were separated, the gang member "look[ed] toward[]" Bermejo's cell, where Bermejo was "standing at the window"; the gang member "flash[ed] [Bermejo] a head nod"; and Bermejo responded, "Stay up, man." In the second incident, an officer observed Bermejo being punched by three men, including a Sureños gang member who was arrested for shooting a Norteños member in August 2017. The officer testified that as Bermejo was being escorted from the area, Bermejo said, "Fuck scraps."

¶38 We are not persuaded the jail incidents evidence prejudiced Bermejo's case. *See Strickland*, 466 U.S. at 687, 694. We acknowledge that evidence of a defendant's custody status can carry a risk of prejudice. Indeed, our supreme court has explained that "while there is little doubt that some prejudice might result from the jury's being informed . . . that a defendant had formerly been in jail, the prejudice must be such that it is unfair," meaning the defendant "must make some showing that the verdict was substantially influenced by the challenged testimony." *See State v. Butterfield*, 2001 UT 59, ¶ 47, 27 P.3d 1133 (quotation simplified); *see also State v. Atkin*, 2006 UT App 155, ¶ 20 n.6, 135 P.3d 894 (noting evidence of incarceration and

probation status "may be prejudicial in certain cases"). But the jury was informed that Bermejo was charged with, among other things, being a party to two counts each of aggravated assault and felony discharge of a firearm. In this respect, and given the violent nature of the charges, it would not have been surprising to the jury to learn Bermejo was incarcerated at the time of trial. *See Atkin*, 2006 UT App 155, ¶ 20 n.6 (concluding that evidence of the defendant's probation and incarceration status was harmless where evidence of the underlying charges that led to the defendant's probation revocation and incarceration was properly before the jury).

¶39    Moreover, other evidence presented during trial, and not challenged by Bermejo, generally alerted the jury to his custody status. For example, the jury heard audio recordings of phone calls Bermejo made from jail, and it was informed that Girlfriend was supposed to have visited him in jail the night before the last day of trial. During cross-examination of Expert, trial counsel also brought up Bermejo's custody status, confirming with Expert that Bermejo was "arrested on December 29, 2016" and had been "incarcerated pending trial ever since," using his custody status to distance Bermejo from the shootings involving the Norteños and the Family. Thus, we are not persuaded the admission of the jail incidents evidence was prejudicial—that is, it seems unlikely that had the jail incidents been excluded, the trial's outcome would have been different. *See Strickland*, 466 U.S. at 687, 694.

¶40    Bermejo also suggests one officer's reference to Bermejo being housed in "maximum security" was particularly prejudicial. The officer testified that at the time of the first incident he was assigned to the "maximum unit of the jail" and Bermejo was there. But the reference was fleeting, and the State did not emphasize or mention it during the remainder of the proceedings. *See Butterfield*, 2001 UT 59, ¶ 47 (rejecting argument that a "fleeting" remark about obtaining the defendant's photo from a photo lineup from the jail "substantially influenced" the verdict (quotation simplified)); *see also Atkin*, 2006 UT App 155,

¶ 20 n.6 (noting evidence of incarceration and probation status "may be prejudicial in certain cases" but not where the jury was aware of the underlying charges related to the probation revocation and incarceration). And we are not persuaded that the impact of that single reference, particularly given the other evidence before the jury about Bermejo's custody status and the nature of the charges against him, was sufficiently harmful to create a reasonable probability that had counsel objected or requested a curative instruction, the outcome of the trial would have been different. *See Strickland*, 466 U.S. at 687, 694.

¶41    For these reasons, we are not persuaded the admission of the jail incidents evidence prejudiced the defense. *See Edgar*, 2017 UT App 54, ¶ 13. Accordingly, Bermejo's ineffective assistance of counsel claim on this point fails.

B.    Expert Testimony

¶42    Bermejo contends trial counsel was ineffective for failing to object "to portions of [Expert's] testimony that exceeded the bounds of Utah's expert-testimony rules." We conclude Bermejo has not established counsel was ineffective on this issue.

¶43    In an initial trial setting,[7] the district court expressed concerns with the State's intention to use Expert to testify with respect to, among other things, the history between the local Norteños and Sureños. In particular, the court stated its belief that the relevant rules—specifically, rules 702 and 703 of the Utah Rules of Evidence[8]—did not anticipate using an expert to

---

7. This case initially was set for trial in June 2018. After the jury had been selected, but before it was sworn in, trial was continued at the State's request. The trial actually took place in September 2018 with a new jury.

8. Rule 702 provides that "a witness who is qualified as an expert by knowledge, skill, experience, training, or education may

(continued…)

testify regarding "a whole wealth of very violent, very serious criminal activity . . . under circumstances where [a defendant] has no opportunity to cross-examine the underlying witnesses." Rather, the court stated that allowing Expert to testify regarding the specific incidents of criminal activity essentially permitted the State to "bootstrap an entire portion of [its] evidence without subjecting it to cross-examination" and use "an expert witness as an opportunity to do an end run around the hearsay rule."

¶44 In response, the State indicated that Expert "was a detective involved in the investigation of the other drive-by shooting at the [Family's] house" and "was involved in the arrest of several of those defendants." The court determined that Expert therefore could "testify as a fact witness with respect to that, . . . assuming that his testimony is otherwise not in violation of a Rule of Evidence."

¶45 During trial, Expert testified about and described the history between local Norteños and Sureños in the months preceding and following the shooting, which included describing particular incidents and the persons involved in them. This placed the shooting in context and strongly suggested it was part of the larger local conflict between the two gangs— and between the Norteños and the Family in particular. Trial counsel did not object to this testimony.

---

(…continued)

testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Utah R. Evid. 702(a). Rule 703 instructs that an expert "may base an opinion on facts or data in the case that the expert has been made aware of or personally observed," but that "if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect." *Id.* R. 703.

¶46　Bermejo contends Expert's testimony about "the history of conflict between local Norteños and Sureños" was improper expert testimony because it constituted fact evidence presented through inadmissible hearsay in violation of the evidence rules applicable to expert testimony. And he argues counsel's failure to object was harmful because if counsel had objected, the district court likely would have excluded the evidence, which would have "remov[ed] from the State's case its theory of motive for the shooting."

¶47　To show deficient performance, Bermejo must "rebut the strong presumption that under the circumstances, the challenged action might be considered sound trial strategy." *State v. Litherland*, 2000 UT 76, ¶ 19, 12 P.3d 92 (quotation simplified). "When viewing the variety of circumstances faced by defense counsel, a conscious choice not to object to arguably inadmissible testimony may, at times, fall within the range of legitimate decisions regarding how best to represent a criminal defendant." *State v. Gray*, 2015 UT App 106, ¶ 44, 349 P.3d 806 (quotation simplified); *see also State v. Squires*, 2019 UT App 113, ¶ 43, 446 P.3d 581. In this respect, a defendant must do more than argue that counsel failed to object to potentially inadmissible testimony. *Gray*, 2015 UT App 106, ¶ 44.

¶48　Here, we conclude Bermejo has not established that his counsel's failure to object constituted deficient performance. Even assuming Expert's testimony was hearsay, counsel reasonably could have determined that an objection likely would not have prevented the local history evidence from being presented to the jury. The State asked for a continuance on the day trial was first set specifically to find additional witnesses "to get in some of the information that was discussed" in that hearing, which was granted. And in response to the court's concerns during the initial trial setting, the State called several witnesses to testify specifically about the two jail incidents in which Bermejo was involved. Viewed in this context, counsel reasonably could have concluded that objecting to Expert's recounting of the specific history between the local Norteños and

Sureños would have triggered more testimony from more fact witnesses rather than prevented presentation of the evidence altogether. As a result, counsel reasonably could have decided to allow Expert to relate the history instead of having several witnesses attest to the same incidents.

¶49 Moreover, the evidence of the local history between the gangs provided a backdrop for a major part of the defense's theory of the case: that the State's case was built primarily on guilt by association rather than on evidence of Bermejo's actual participation in the shooting. In its closing argument, the State used the local history to suggest Bermejo participated in the shooting because the gang was "his family" and it was "who he want[ed] to be." In response, trial counsel highlighted that notwithstanding Bermejo's gang membership, the State lacked evidence tying him to the crime scene; showing his knowledge, intent, and opportunity related to the shooting; and generally connecting him to this particular shooting. Counsel also emphasized the evidence that Bermejo joined the gang for social reasons and pointed out there was no evidence suggesting that he had a history of participating in similar violence, that he was the "mastermind" of and planned the shooting, or that he desired to participate in criminal activity as opposed to enjoying the social opportunities the gang afforded. Thus, given the defense's theory of the case and counsel's attempt to establish reasonable doubt by suggesting that other, senior gang members carried out the shooting, counsel could have made a reasonable tactical choice not to object to Expert's recounting of the local history. *See State v. Clark*, 2004 UT 25, ¶ 7, 89 P.3d 162 (concluding counsel made a reasonable tactical decision by not objecting to potentially inadmissible testimony where, among other things, counsel "primarily drew upon [the] testimony in formulating its strategic defense").

¶50 For these reasons, Bermejo has not established that counsel performed deficiently in failing to object to Expert's testimony, and his claim for ineffective assistance on this point accordingly fails.

C.      Accomplice Liability Instructions

¶51    Bermejo contends trial counsel was ineffective for failing to object to the accomplice liability instructions. "To evaluate whether trial counsel performed deficiently in failing to object to the jury instructions, we must first consider whether those instructions were legally correct." *State v. Liti*, 2015 UT App 186, ¶ 12, 355 P.3d 1078; *accord State v. Eyre*, 2019 UT App 162, ¶ 14, 452 P.3d 1197, *cert. granted*, 462 P.3d 797 (Utah 2020). "If the instruction was correct, [Bermejo] cannot establish deficient performance for failing to object to it." *See State v. Powell*, 2020 UT App 63, ¶ 24, 463 P.3d 705; *see also State v. Lee*, 2014 UT App 4, ¶ 22, 318 P.3d 1164.

¶52    "Jury instructions must be read and evaluated as a whole. They must accurately and adequately inform a criminal jury as to the basic elements of the crime charged." *State v. Augustine*, 2013 UT App 61, ¶ 9, 298 P.3d 693 (quotation simplified). "Even if one or more of the instructions, standing alone, are not as full or accurate as they might have been, counsel is not deficient in approving the instructions as long as the trial court's instructions constituted a correct statement of the law." *Lee*, 2014 UT App 4, ¶ 23 (quotation simplified).

¶53    Bermejo asserts the accomplice liability instructions were incorrect because "they failed to make clear the requirement that [he] act with the intent that the underlying crimes be committed" and thus allowed the "jury to convict based on abstract notions of intent." More specifically, he argues the instructions "erroneously suggested that the intentional mental state applied only to the actions of 'solicited, requested, commanded, encouraged,' or intentionally aided." (Quotation simplified.) The State disagrees, contending the instructions "expressly included" the requirement that Bermejo act with the required mental state for the underlying offense and that the instructions "as a whole are consistent" with Utah law. We agree with the State.

¶54 "Accomplice liability adheres only when the accused acts with the mens rea to commit the principal offense." *State v. Jeffs*, 2010 UT 49, ¶ 43, 243 P.3d 1250 (quotation simplified). This "essential principle" of accomplice liability is reflected in the accomplice liability statute, *see id.* ¶¶ 43–44, which provides, "Every person, acting with the mental state required for the commission of an offense . . . , who solicits, requests, commands, encourages, or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable as a party for such conduct," Utah Code Ann. § 76-2-202 (LexisNexis 2017).

¶55 Here, the jury was given four instructions regarding accomplice liability. Instruction 19 informed the jury:

> A person can commit a crime as a "party" to the offense. In other words, a person can commit a criminal offense even though that person did not personally do all of the acts that make up the offense. If you find beyond a reasonable doubt that:
>
> (1) the defendant had the mental state required to commit the offense, AND
>
> (2) the defendant intentionally, knowingly, or recklessly solicited, requested, commanded, encouraged, or intentionally aided another to commit the offense, AND
>
> (3) the offense was committed,
>
> then you can find the defendant guilty of that offense.

Instruction 20 informed the jury that a "'party to the offense' need not act with the same mental state as the principal" or "have the same intent that the principal actor possessed as long as the party to the offense intended that an offense be

committed." *See Jeffs*, 2010 UT 49, ¶ 49 ("It is not necessary for the accomplice to have the same intent that the principal actor possessed as long as the accomplice intended that an offense be committed." (quotation simplified)). Instruction 21 provided, "While mere presence at the scene of a crime affords no basis for a conviction, presence, companionship, and conduct before and after the offense are circumstances from which one's participation in the criminal intent may be inferred." And Instruction 22 quoted the governing statute, reciting, "Every person, acting with the mental state required for the commission of an offense who directly commits the offense, who solicits, requests, commands, encourages, or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable as a party for such conduct." *See* Utah Code Ann. § 76-2-202.

¶56 Additionally, for each of the charges in which Bermejo was charged as a party to the offense—two counts of felony discharge of a firearm, one count of obstructing justice, and two counts of aggravated assault—the jury was instructed on the elements of each crime, which included the required mental states. The aggravated assault instructions informed the jury that Bermejo committed one of the variant acts of aggravated assault "as a party to the offense" if he "did so knowingly, intentionally, or recklessly." Likewise, the discharge of a firearm instructions told the jury that Bermejo acted "as a party to the offense" if he did so "knowing or having reason to believe that any person may be endangered by the discharge of the firearm," "[w]ith intent to intimidate or harass another," or "with intent to damage a habitable structure." And the obstructing justice instruction provided that the jury had to find that Bermejo, "as a party to the offense," took certain actions "with intent to hinder, delay, or prevent the investigation, apprehension, prosecution, conviction, or punishment of any person regarding conduct that constitutes a criminal offense."

¶57 We conclude the accomplice liability instructions, in conjunction with the instructions outlining the statutory

elements of the various underlying crimes, adequately and correctly instructed the jury about the mens rea required to convict Bermejo as an accomplice to the charged crimes. *See Eyre*, 2019 UT App 162, ¶¶ 17–19. To begin with, Instruction 22 is a verbatim recitation of the statute addressing accomplice liability, Utah Code section 76-2-202. Like the statutory provision, Instruction 22 told the jury that to be "criminally liable as a party," a person must "act[] with the mental state required for the . . . offense." *See* Utah Code Ann. § 76-2-202; *see also State v. Clark*, 2014 UT App 56, ¶¶ 52, 55, 322 P.3d 761 (concluding the jury instructions adequately instructed on accomplice liability where, among other things, one of the relevant instructions "was copied nearly verbatim from Utah's accomplice liability statute"). In addition, Instruction 19 plainly instructed the jury that to find that Bermejo "commit[ted] a crime as a 'party' to the offense," the jury had to "find beyond a reasonable doubt that . . . the defendant had the mental state required to commit the offense" and that this requirement was *in addition to* finding that the defendant acted with the required mental state for aiding the commission of the offense.

¶58　Further, although the accomplice liability instructions—as well as the governing statute, *see* Utah Code Ann. § 76-2-202—perhaps could have been more precise in their seemingly interchangeable use of the phrases "an offense" and "the offense" when referring to the principal offense as requiring the accompanying mental state,[9] when read with the elements

---

9. For example, although Instruction 22 is a verbatim statement of the accomplice liability provision under Utah Code section 76-2-202, the statutory provision speaks both of "the offense" and "an offense" in setting out what is required for a person to be "criminally liable as a party" for certain conduct. Utah Code Ann. § 76-2-202 (LexisNexis 2017). Our supreme court has employed similar language. *See State v. Jeffs*, 2010 UT 49, ¶ 49, 243 P.3d 1250 ("It is not necessary for the accomplice to have the same intent that the principal actor possessed as long as the

(continued…)

instructions, the mens rea requirement for accomplice liability was adequately explained to the jury. *See Jeffs*, 2010 UT 49, ¶ 49; *Eyre*, 2019 UT App 162, ¶ 19. Here, one of the instructions was taken verbatim from the governing statute, and another is in line with *Jeffs*. In addition, the accompanying elements instructions included language regarding the mental state required for committing each particular offense with which Bermejo was charged as a party. And reading the elements instructions along with the accomplice liability instructions—especially Instructions 19 and 22—the jury thereby was informed it had to find beyond a reasonable doubt *both* that Bermejo acted with the specific mental state required for each of the charged offenses and that he "intentionally, knowingly, or recklessly solicited, requested, commanded, encouraged, or intentionally aided another to commit" those offenses. *See Clark*, 2014 UT App 56, ¶¶ 54–55; *Augustine*, 2013 UT App 61, ¶ 10.

¶59   "It is not deficient performance for counsel to agree to jury instructions that accurately and adequately inform the jury of the relevant law." *Eyre*, 2019 UT App 162, ¶ 20. Because the instructions adequately informed the jury about the mens rea requirement for accomplice liability, counsel did not perform deficiently in forgoing an objection to them. Accordingly, Bermejo's ineffective assistance of counsel claim on this issue fails.

---

(…continued)

accomplice intended that *an offense* be committed." (emphasis added) (quotation simplified)). Nevertheless, this language can be confusing, and we urge district courts to use jury instructions employing language that makes clear that an accomplice must act with the mental state required for the commission of the offense in question (the offense) and may not be convicted as an accomplice to that offense if he had only the intent that a different (usually lesser) offense was to be committed.

## II. Police Interview Video Recording

¶60     Bermejo contends the district court erred under rule 17 of the Utah Rules of Criminal Procedure by allowing the jury to have access during deliberations to a video recording of his police interview. Relying on *State v. Cruz*, 2016 UT App 234, 387 P.3d 618, he argues the interview "constituted a testimonial exhibit that should not have been available in the jury room." And he argues the video's availability during deliberations was harmful because it was an exhibit "that captured [his] lie" and allowed the jury to have access to an exhibit that "was the focal point of the State's closing." We disagree.

¶61     After closing arguments, the court addressed whether the jury should have access during deliberations to the video of Bermejo's police interview. Trial counsel relied on *Cruz* to argue the jury should not have access to it, but the court disagreed. The court observed that in *Cruz*, the recorded statement was a "recording of a child victim" that was "actually introduced as testimony of that child" during the trial and the interview involved "an inquiry akin to a direct examination," not an interrogation. The court reasoned that under the circumstances in *Cruz*, it would seem "inappropriate to have [had] that video tape go back because it was . . . in essence . . . the jury having a recording of one witness's testimony." In contrast, the court observed the police interview video in this case was "an interrogation of an adverse party which is being introduced as both [an] admission and a[n] inconsistent statement," not "for the purpose of testimony." On this basis, the court concluded the interview was "substantive evidence that is not testimonial in nature" and that *Cruz* therefore was "not applicable."

¶62     Rule 17 generally permits the jury to have access to most exhibits. It provides, "Upon retiring for deliberation, the jury may take with them the instructions of the court and all exhibits which have been received as evidence, except exhibits that should not, in the opinion of the court, be in the possession of the jury, such as exhibits of unusual size, weapons or

contraband." Utah R. Crim. P. 17(k); *see also Allen v. Friel*, 2008 UT 56, ¶ 32, 194 P.3d 903. "Although this rule permits the jury to take most exhibits into the deliberations[,] exhibits which are testimonial in nature should not be given to the jury during its deliberations." *State v. Eyre*, 2019 UT App 162, ¶ 30, 452 P.3d 1197 (quotation simplified), *cert. granted*, 462 P.3d 797 (Utah 2020).

¶63    "The law has 'always excluded depositions and written testimony from being carried from the [courtroom] by the jury,'" and the rationale for doing so has been to "deny written evidence an 'undue advantage.'" *Cruz*, 2016 UT App 234, ¶ 36 (quoting *State v. Solomon*, 87 P.2d 807, 811 (Utah 1939)); *see also* 2 *McCormick on Evidence* § 220 (8th ed. 2020) (stating that "writings which are testimonial in nature, such as depositions, dying declarations in writing, etc. are typically not taken in with the jury," as "such writings, viewed as simply a different form of testimony, should not be unduly emphasized over oral testimony in the case"). As our supreme court explained in *Solomon*:

> It may often happen that the testimony on one side is oral from witnesses produced before the jury, while the testimony for the other side on essential matters is in the form of depositions or in the transcript from testimony at a previous hearing. If the hearing lasts for any length of time and the jury takes the depositions or transcript to be read and discussed while the oral evidence contra has in a measure faded from the memory of the jurors, it is obvious that the side sustained by written evidence is given an undue advantage. The law does not permit depositions or witnesses to go to the jury room. Why should a witness be permitted to go there in the form of written testimony?

87 P.2d at 811. This court has since explained that the "concerns expressed by the *Solomon* court . . . about written testimony

apply with equal force to video recorded testimony" because "a video recording of this type poses the same danger of undue emphasis as would the transcript of the witness's live trial testimony." *Cruz*, 2016 UT App 234, ¶ 39 (quotation simplified). Nevertheless, we emphasized in *Cruz* "that this rule does not apply to all video recordings; many video recordings shown in court are not testimonial in nature and so would ordinarily be permitted in the jury room unless they should not, in the opinion of the court, be in the possession of the jury." *Id.* ¶ 40 (quotation simplified).

¶64   As this court observed in *Eyre*, "Utah law has only extended this principle to recorded or transcribed testimony that substitutes a witness's live testimony," and "Utah appellate courts have not treated recordings of defendants' police interviews as testimonial in nature for purposes of excluding them from the jury room." 2019 UT App 162, ¶ 31 (quotation simplified). Bermejo asserts the police interview video at issue here is testimonial, likening it to the Children's Justice Center (CJC) interview at issue in *Cruz*. Specifically, he asserts that, as in *Cruz*, the interview was "recorded," "the video captured an interview with a witness who appeared and testified at trial," and "the video was a recording of an interview with the police," which was "taken by police for the purpose of prosecuting crime." (Quotation simplified.)

¶65   But Bermejo does not acknowledge the key difference between the CJC interview in *Cruz* and his police interview: the video at issue in *Cruz* captured an out-of-court interview of a *witness*, while the video at issue here captured an out-of-court interview of a *defendant*. And as we noted in *Eyre*, although Utah courts have not decided this question, other jurisdictions considering the issue have "allow[ed] juries to have access" to recorded interviews capturing out-of-court statements by a defendant. 2019 UT App 162, ¶ 32; *see also, e.g.*, *Rael v. People*, 2017 CO 67, ¶¶ 30–35, 395 P.3d 772 (en banc) (explaining that concerns related to "videotaped, out-of-court statements of child-victims" "do not apply to a defendant's own out-of-court

statements"); *State v. Castelli*, 101 A. 476, 480 (Conn. 1917) ("Writings made or subscribed by the accused are ordinarily admitted as exhibits. If these writings were harmful, it was not because any rule of procedure was violated, but because the accused had furnished harmful evidence against themselves."); *Lucas v. State*, 34 So. 3d 195, 196 (Fla. Dist. Ct. App. 2010) (concluding the court did not abuse its discretion in allowing the "videotape of [the defendant's] voluntary statement to the police" to go with the jury into deliberations because the videotaped statement "was not a substitute for [the defendant's] live testimony at trial"); *State v. Robinson*, 903 P.2d 1289, 1293–94 (Haw. 1995) (explaining that a defendant's "taped confession is a tangible exhibit which is non-testimonial in character," and holding that "a videotape of a defendant's confession . . . may be taken into the jury room during deliberations" (quotation simplified)); *State v. Cheloha*, 907 N.W.2d 317, 326–27 (Neb. Ct. App. 2018) (concluding there was no abuse of discretion in allowing the jury access to a videotape of the defendant's police interrogation, where the video was properly characterized as "substantive, nontestimonial evidence"); *State v. Dugas*, 782 A.2d 888, 896 (N.H. 2001) (rejecting argument that the court erred in submitting audiotapes of "two police interviews with the defendant," reasoning such exhibits "are not testimonial"). Indeed, allowing written or recorded confessions or admissions by a defendant to go with the jury into deliberations appears to be the majority view. *See McAtee v. Commonwealth*, 413 S.W.3d 608, 624 & n.11 (Ky. 2013) (stating "the majority of jurisdictions allow a recorded confession—written or electronic—to go to the jury room during deliberations" and collecting cases); *see also* 2 *McCormick on Evidence* § 220 (8th ed. 2020); Jonathan M. Purver, Annotation, *Permitting Documents or Tape Recordings Containing Confessions of Guilt or Incriminating Admissions to be Taken into Jury Room in Criminal Case*, 37 A.L.R.3d 238 (1971) (updated 2012).

¶66    The reasoning in *Carter v. People*, 2017 CO 59M, 398 P.3d 124, is particularly persuasive on the issue of whether during deliberations the jury should have access to a defendant's

recorded confessions or admissions. There, the Colorado Supreme Court concluded the trial court did not abuse its discretion by allowing the jury to access during its deliberations a video of the defendant's custodial interrogation. *Id.* ¶¶ 16–24. The court first explained that "out-of-court statements of a party offered against that party have . . . never been considered primarily testimonial in nature," *id.* ¶ 18, and that similarly, "confessions or out-of-court statements by criminal defendants sufficiently harmful to be offered into evidence by the prosecution have historically been allowed into the jury room," *id.* ¶ 19. This is so, the court reasoned, because:

> [i]n addition to having probative force for reasons more related to the adversary process than any narrative or testimonial value a defendant's detrimental out-of-court statements may have, allowing the jury access to exhibits evidencing such statements simply does not implicate the same danger of undue emphasis inherent in permitting the jury access to some, but not all, of the testimonial evidence. Unlike testimonial evidence, the accuracy and veracity of which must be weighed in conjunction with all of the other admissible evidence, a criminal defendant's out-of-court statement offered against him has value primarily as demonstrative evidence of conduct on his part that is contradictory of a position he takes at trial.

*Id.* ¶ 21; *see also id.* ¶¶ 18–19 (stating that "despite possibly having some narrative value, a party opponent's out-of-court utterances offered against him have probative force simply as non-verbal or non-narrative conduct, which is assertedly in conflict with a position he takes at trial," and that the use of such statements involves considerations of "adversarial fairness"). Thus, the court continued, "While a trial court may find grounds to restrict a jury's access to such exhibits under particular circumstances, they would not typically be the same reasons that

might lead it to caution the jury concerning the use of, or limit its access to, testimonial exhibits." *Id.* ¶ 22.

¶67 We are persuaded by the reasoning of *Carter* and those jurisdictions that have concluded that a defendant's recorded, out-of-court interview is not testimonial for purposes of determining whether to allow the jury to have access to it during deliberations. *See id.* ¶ 21. *See generally Testimonial evidence*, Black's Law Dictionary (11th ed. 2019) (defining "testimonial evidence" as "[a] person's testimony offered to prove the truth of the matter asserted; esp., evidence elicited from a witness"); *Testimony*, Black's Law Dictionary (11th ed. 2019) (defining "testimony" as "[e]vidence that a competent witness under oath or affirmation gives at trial or in an affidavit or deposition").

¶68 The State introduced the video of the police interview during the investigating detective's testimony. The interview took place the day after the shooting. During the interview, Bermejo denied having been in Salt Lake City at all on the day of the shooting and stated that his car went missing from Ogden where he left it at his friend's house, which the friend alerted him to between 1:00 p.m. and 2:00 p.m. the day of the shooting.

¶69 But during the defense's case-in-chief, Bermejo testified he was untruthful with police during the interview, explained he was afraid of gang retaliation, and affirmed his opinion that it was safer to lie to the police than to be truthful about the gang members. Further, in their closing arguments, the State and the defense each reiterated and used Bermejo's untruthfulness to police in the videotaped interview to support their respective positions. For its part, the State used Bermejo's untruthfulness to generally attack his credibility and suggest he was lying when he testified about what happened on the day of the shooting. Trial counsel, on the other hand, used the same lack of candor in the interview to support the narrative that Bermejo was unwillingly "set up" by other gang members and was afraid— justifiably so, given the "serious, serious world" of gang membership—of the repercussions if he told the truth.

¶70   Thus, the jury was informed by the State, the defense, and by Bermejo himself, that his statements during his initial interview were not credible. In this respect, we agree with the district court that, rather than being introduced as testimony, Bermejo's police interview primarily was introduced and used as an admission and a prior inconsistent statement. Indeed, given that the State and the defense each used the video, the jury had little reason to credit Bermejo's statements on the video as testimony about the events to be weighed for their truthfulness rather than view them as "demonstrative evidence of [Bermejo's] capacity for fabrication and self-preservation" and "of conduct on his part that is contradictory of a position he takes at trial." *See Carter*, 2017 CO 59M, ¶¶ 21, 24.

¶71   We agree with the district court that Bermejo's police interview was not testimonial evidence. Accordingly, we conclude the court did not err, under rule 17 of the Utah Rules of Criminal Procedure, by allowing the jury to have access during deliberations to the video.

### III. Mistrial Motion

¶72   Bermejo contends the district court exceeded its discretion by denying his mistrial motion. He also contends, in the alternative, trial counsel was constitutionally ineffective when he failed to object and renew his mistrial motion during the prosecutor's closing argument. We address each issue below.

#### A.   The Mistrial Motion

¶73   Bermejo argues the prosecutor made improper comments during the State's rebuttal to the defense's case-in-chief that "called attention to matters the jury was not justified in considering." Specifically, he argues the prosecutor's comments suggested that "[Bermejo] improperly encouraged [Girlfriend] not to testify at trial" and that "counsel knew about [Bermejo's] conduct [and] was not forthright about [that] knowledge." These comments, he argues, "insinuated additional evidence did exist"

that Bermejo "had influenced [Girlfriend's] decision not to appear and testify at trial." And he asserts that given the nature of the comments, the "only adequate remedy was a mistrial" because trial counsel was left with "no good option" for adequately dealing with the harm flowing from the comments. We disagree.

¶74    Because "prosecutorial misconduct is not a standalone basis for independent judicial review," "when a defendant has raised an alleged prosecutorial misconduct issue below, we review the district court's ruling on that objection or motion." *State v. Reid*, 2018 UT App 146, ¶ 40, 427 P.3d 1261 (quotation simplified); *see also State v. Hummel*, 2017 UT 19, ¶ 107, 393 P.3d 314 ("Appellate courts review the decisions of lower courts. We do not review the actions of counsel—at least not directly."). Here, the relevant ruling is the district court's denial of Bermejo's mistrial motion.

¶75    "A mistrial is strong medicine." *State v. Whytock*, 2020 UT App 107, ¶ 16, 469 P.3d 1150. "In view of the practical necessity of avoiding mistrials and getting litigation finished, the trial court should not grant a mistrial except where the circumstances are such as to reasonably indicate that a fair trial cannot be had and that a mistrial is necessary to avoid injustice." *State v. Butterfield*, 2001 UT 59, ¶ 46, 27 P.3d 1133 (quotation simplified); *accord State v. Dunne*, 2020 UT App 56, ¶ 18, 463 P.3d 100. Once the district court "has exercised its discretion and made its judgment [about a mistrial motion], the prerogative of a reviewing court is much more limited." *Butterfield*, 2001 UT 59, ¶ 46 (quotation simplified). "Because a district judge is in an advantaged position to determine the impact of courtroom events on the total proceedings, once a district court has exercised its discretion and denied a motion for a mistrial," an appellate court "will not reverse the court's decision unless it is plainly wrong in that the incident so likely influenced the jury that the defendant cannot be said to have had a fair trial." *State v. Allen*, 2005 UT 11, ¶ 39, 108 P.3d 730 (quotation simplified). Further, Bermejo bears the burden of "showing that the

challenged incident substantially influenced the verdict." *State v. Murphy*, 2019 UT App 64, ¶ 37, 441 P.3d 787 (quotation simplified).

¶76 Evaluating a denial of a mistrial motion requires us to consider the totality of evidence against the defendant and the circumstances surrounding the improper statements. *See State v. Milligan*, 2012 UT App 47, ¶ 8, 287 P.3d 1 (looking to the circumstances surrounding the potentially prejudicial comments to determine whether the district court abused its discretion in denying a mistrial motion); *see also Dunne*, 2020 UT App 56, ¶ 19; *State v. Yalowski*, 2017 UT App 177, ¶ 22, 404 P.3d 53.

¶77 Our supreme court has determined a mistrial is not required in circumstances where an improper statement is "vague" and "fleeting," *see Butterfield*, 2001 UT 59, ¶ 47 (quotation simplified), "made in passing," "relatively innocuous in light of all the testimony presented," *Allen*, 2005 UT 11, ¶ 40, "very brief," and "stat[es] no details of the circumstances" surrounding the subject of the comments, *State v. Griffiths*, 752 P.2d 879, 883 (Utah 1988), and where, following the statement, the proceedings "move[d] along without undue interruption and directed the jury's attention to other matters," *State v. Decorso*, 1999 UT 57, ¶ 39, 993 P.2d 837, *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016; *see also Dunne*, 2020 UT App 56, ¶ 23 (noting, in concluding that the district court did not abuse its discretion in denying a mistrial motion, that "the court immediately sustained [the defendant's] objection" to the problematic questions and statements, and "no further reference was made" to them). Additionally, our appellate courts have considered the district court's offers to cure any alleged harm and trial counsel's response in evaluating whether the court's mistrial motion decision was an abuse of discretion. *See Allen*, 2005 UT 11, ¶ 43 (supporting a conclusion that the district court had not abused its discretion in denying a mistrial motion with the district court's offer "to give the jury a curative instruction regarding the [improper] reference, which [the defendant] declined"); *accord Whytock*, 2020 UT App 107, ¶¶ 20–21.

¶78    Applying these principles, we conclude the district court did not abuse its discretion in denying the mistrial motion. During its rebuttal to the defense's case-in-chief, the State recalled Detective, who affirmed that after initial interviews with Girlfriend and Bermejo following the shooting, he expected Girlfriend to be "an important witness in th[e] case." The State questioned Detective about his efforts to find Girlfriend when she did not appear in court, which included obtaining a "search warrant to ping her phone" and conducting "a manhunt in a sense" to find her, all without success. The State then stipulated there was "no evidence of [Bermejo] making direct contact to [Girlfriend] to tell her directly," "[o]r even indirectly," "not to come to court."

¶79    In cross-examination, trial counsel questioned Detective about the lack of evidence that Bermejo influenced Girlfriend's decision to not appear at court, suggesting any assertion that Bermejo influenced her through "an advocate working for him" or "allegedly speaking for him" was "pure speculation." On re-direct, the State initially focused on this point in the following exchange:

> Q: [Defense counsel] suggested that your idea that other people would be trying to influence [Girlfriend's] decision on his behalf was just speculation.
>
> A: Yes, it's just speculation.
>
> Q: Is it actually just speculation?
>
> A: No. We obtained a search warrant for—

Trial counsel objected, stating that the questioning had "gone beyond rebuttal"; the district court sustained the objection. The State responded, "Your Honor, he opened the door. He said that this was just speculation and he knew well that it's not just speculation." The prosecutor and trial counsel approached the

bench for a sidebar conference and then, once again on the record before the jury, the State questioned Detective on an entirely different issue.

¶80    Later, after closing instructions, the prosecutor told the court that his statement that "Defense counsel knew full well" that it was not speculation was "inaccurate" and that he believed he "need[ed] to correct that for the jury." The prosecutor suggested either a curative instruction or that he tell the jury that his statement inaccurately reflected his "impression he knew about something."

¶81    In response, trial counsel said he was "torn" about how to address the issue with the jury because doing so would suggest that there was "some evidence" when none had been presented and that counsel "knew something." He said he believed he "need[ed] to move for a mistrial" rather than address it with the jury because he considered the situation harmful to the defense either way. And he informed the court he intended to "handle" the "correction" suggested by the prosecutor "in closing."

¶82    The district court denied the mistrial motion "primarily because . . . there is an opportunity to correct the record," stating that "a curative instruction . . . would go a long way to correct the issue." The court also stated it understood why trial counsel did not want to seek a curative instruction as a matter of strategy. And it determined the prosecutor's statements "appeared to be inadvertent" and "pretty fleeting" and were "not an incident that would have called the jury's attention" where "there was no exclamation point on it."

¶83    Under these circumstances, the district court's decision to deny the mistrial motion was not an abuse of discretion. To begin with, the prosecutor's suggestion about Bermejo's influence on Girlfriend and what trial counsel knew was innocuous in light of the trial testimony. The statements came at the end of a four-day trial, one in which nineteen witnesses testified. The statements also occurred in a short exchange

covering half a page in more than 800 pages of transcript. *See Allen*, 2005 UT 11, ¶ 40 (concluding improper statements that are "made in passing" and "relatively innocuous in light of all the testimony presented" do not warrant a mistrial); *cf. Murphy*, 2019 UT App 64, ¶ 39 (reasoning, in concluding that the district court did not abuse its discretion in denying a mistrial motion, that the improper testimony at issue was "made in passing" and "consisted of a single sentence in a trial transcript that exceeds 1,000 pages"); *State v. White*, 2016 UT App 241, ¶ 44, 391 P.3d 311 (concluding that two objectionable statements "were relatively innocuous in light of all the other testimony presented," where the witness who offered the statements "was one of nearly a dozen witnesses who testified at trial over a period of three days" and the "statements—or references to them—appear on just two of more than 800 transcript pages").

¶84 Trial counsel also promptly objected to the prosecutor's line of questioning as beyond rebuttal. And immediately after a sidebar conference on the issue, the prosecutor resumed questioning on a completely different issue. *See Decorso*, 1999 UT 57, ¶ 39. And the district court offered trial counsel the option for a curative instruction, which counsel declined in favor of not highlighting the issue for the jury. *See Allen*, 2005 UT 11, ¶ 43.

¶85 Under these circumstances, "we cannot agree that the jury was so likely influenced" by the prosecutor's suggestion that Bermejo pressured Girlfriend not to appear in court, and that trial counsel knew it, "that the court was plainly wrong to deny [Bermejo's] mistrial motion." *See Dunne*, 2020 UT App 56, ¶ 25 (quotation simplified). Thus, we conclude the district court did not abuse its discretion in denying Bermejo's mistrial motion.

B.     Ineffective Assistance of Counsel During Closing
       Arguments

¶86 In the alternative, Bermejo argues his trial counsel provided ineffective assistance by not renewing his objection

during closing arguments when the prosecutor again raised the issue of Girlfriend's absence.[10] We disagree.

¶87    During closing argument, in talking about Bermejo's version of events and the fact that he claimed to have dropped off Girlfriend at work the morning before the shooting, the State reviewed the evidence about her work schedule, especially the fact that her time clock records showed she arrived that day hours after the shooting, not in the morning. The State then stated:

> Defense counsel asked, "Well, do people cover for each other?"
>
> I mean, I guess everybody is like his client and makes up stories. His client admitted he lied to the police. I guess now he wants us to believe that somebody lied on a time card. Because if somebody lied on a time card, then his client is telling the truth. But [Girlfriend] had just started working there eight days before. Was she already taking vacation and somebody was clocking in a time? No.
>
> When you come into this courtroom, your commonsense does not stay out in the hallway.

---

10. Trial counsel did not object during the prosecutor's closing argument when the prosecutor again addressed the issue of Girlfriend's absence. Accordingly, Bermejo asks that we review this issue under the ineffective assistance of counsel exception to our preservation requirement. *See generally State v. Johnson*, 2017 UT 76, ¶¶ 18–19, 416 P.3d 443 (stating that "[a] failure to preserve an issue in the trial court generally precludes a party from arguing that issue in an appellate court, absent a valid exception," and identifying ineffective assistance of counsel as a valid exception).

> What makes sense? What makes sense as to why, with a warrant, the State cannot get [Girlfriend]. Cannot get her here to come in and testify. And it's true, the defendant does not have to produce any evidence. It is the State's burden. And we have tried to get [Girlfriend] to come in here.
>
> We have pinged her phone. We have gotten a warrant for her. We have knocked on doors. And she does not want to come in here and testify. Ask yourselves why. What did she say back in 2016? What would she be forced to say now? Why doesn't she want to be here? It doesn't fit.

Bermejo argues these statements, along with the previous questioning and commentary about Girlfriend's absence, "could only be interpreted as meaning that [Bermejo] had influenced [Girlfriend's] decision not to come" and suggested that trial counsel was "intentionally misleading the jury" on the issue. (Quotation simplified.) He asserts counsel provided ineffective assistance by not objecting to these statements.

¶88    "In closing counsel have considerable latitude in the points they may raise." *State v. Hummel*, 2017 UT 19, ¶ 110, 393 P.3d 314 (quotation simplified). Counsel "have the right to fully discuss from their perspectives the evidence and all inferences and deductions it supports," and "a prosecutor has the duty and right to argue the case based on the total picture shown by the evidence." *State v. Houston*, 2015 UT 40, ¶ 76, 353 P.3d 55 (quotation simplified). "When we review an attorney's failure to object to a prosecutor's statements during closing argument, the question is not whether the prosecutor's comments were proper, but whether they were so improper that counsel's only defensible choice was to interrupt those comments with an objection." *State v. Hulse*, 2019 UT App 105, ¶ 44, 444 P.3d 1158 (quotation simplified). And "the law recognizes the prerogative of opposing counsel to swallow their tongue instead of making an objection that might have the risk of highlighting problematic

evidence or even just annoying the jury." *Hummel*, 2017 UT 19, ¶ 110; *see also Hulse*, 2019 UT App 105, ¶ 45.

¶89    Here, although the prosecutor's comments during closing arguments may well have been at least in part improper, particularly in their tendency to suggest counsel played some part in Girlfriend's absence, Bermejo has not carried his burden of demonstrating that counsel performed deficiently by not objecting and renewing his mistrial motion. As a matter of strategy, counsel reasonably could have concluded a mistrial motion would not be granted, especially given the district court's reasoning in denying the previous mistrial motion. *See State v. Torres*, 2018 UT App 113, ¶ 16, 427 P.3d 550 ("Because the decision not to pursue a futile motion is almost always a sound trial strategy, counsel's failure to make a motion that would be futile if raised does not constitute deficient performance." (quotation simplified)); *see also State v. Ray*, 2020 UT 12, ¶¶ 31, 34, 469 P.3d 871 (stating that "the reasonableness of counsel's challenged conduct" must be judged "on the facts of the particular case, viewed as of the time of counsel's conduct" and that "if it appears counsel's actions could have been intended to further a reasonable strategy, a defendant has necessarily failed to show unreasonable performance" (quotation simplified)).

¶90    Counsel also reasonably could have decided that rather than highlight the overall issue for the jury, he instead would "reserve for himself the right to argue inferences from the evidence during his own closing argument." *See State v. Roberts*, 2019 UT App 9, ¶ 20, 438 P.3d 885; *see also Hummel*, 2017 UT 19, ¶ 110. Indeed, in addressing the timeline of events, trial counsel stated that even though the prosecution wanted the jury to believe that Bermejo "totally made . . . up" what had occurred in the hours before the shooting, including "seeing his girlfriend," the evidence "corroborates and verifies what [Bermejo is] actually saying. There aren't any exceptions. It's all there."

¶91    We conclude Bermejo has not shown the prosecutor's comments were so improper that trial counsel's "only defensible

choice was to interrupt those comments with an objection." *Hulse*, 2019 UT App 105, ¶ 44 (quotation simplified). Rather, as a matter of reasonable strategy counsel could have decided to forgo an objection and renewal of his mistrial motion. On this basis, Bermejo has not established that trial counsel performed deficiently, and therefore, his claim of ineffective assistance is unavailing.

## CONCLUSION

¶92   Bermejo has not shown that trial counsel rendered constitutionally ineffective assistance of counsel on any of the grounds asserted, that the district court erred in allowing the police interview video to go with the jury during deliberations, or that the court abused its discretion in denying the mistrial motion. Accordingly, we affirm.

_____